UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,        Civil Case No.
               Honorable:

vs.

ONE THOUSAND SEVEN HUNDRED
FIFTY SIX DOLLARS AND THREE CENTS
($1,756.03) IN U.S. CURRENCY FROM
HUNTINGTON NATIONAL BANK
ACCOUNT NO. XXXXXXX0024;
THIRTY EIGHT THOUSAND FOUR
HUNDRED EIGHTY NINE DOLLARS
($38,489.00) IN U.S. CURRENCY FROM
HUNTINGTON NATIONAL BANK ACCOUNT
NO. XXXXXXX3366;
TWENTY FOUR THOUSAND SEVEN HUNDRED
THIRTY NINE DOLLARS AND SEVENTY NINE
CENTS ($24,739.79) IN U.S. CURRENCY FROM
HUNTINGTON NATIONAL BANK ACCOUNT
NO. XXXXXXX8440;
ONE HUNDRED NINETY TWO THOUSAND
FOUR HUNDRED THIRTY TWO DOLLARS AND
NINETY NINE CENTS ($192,432.99) IN U.S. CURRENCY
FROM CHEMICAL BANK ACCOUNT NO. XXXXX0154;
SIXTY ONE THOUSAND FOUR HUNDRED NINETY
FOUR DOLLARS AND FORTY ONE CENTS ($61,494.41)
IN U.S. CURRENCY FROM MICHIGAN STATE
FEDERAL CREDIT UNION ACCOUNT NO. XXX047-20;
TWENTY THOUSAND FIVE HUNDRED
SEVENTY THREE DOLLARS AND SIXTY
CENTS ($20,573.60) FROM MICHIGAN STATE
FEDERAL CREDIT UNION ACCOUNT NO. XXX047-80;
FOURTEEN THOUSAND NINE HUNDRED THREE
DOLLARS AND TWENTY FIVE CENTS ($14,903.25)

IN U.S. CURRENCY FROM MICHIGAN STATE
UNIVERSITY FEDERAL CREDIT UNION
ACCOUNT NO. XXX625-26;
ALL FUNDS ON DEPOSIT IN MICHIGAN
STATE FEDERAL CREDIT UNION
ACCOUNT NO. XXX625-C0;
FOUR THOUSAND SIX HUNDRED NINETY
EIGHT DOLLARS AND FIVE CENTS ($4,698.05)
IN U.S. CURRENCY FROM MICHIGAN
STATE FEDERAL CREDIT UNION ACCOUNT NO. XXX625-86;
ALL FUNDS ON DEPOSIT IN TD AMERITRADE
ACCOUNT NO. XXX-XX2918;
ALL FUNDS ON DEPOSIT IN VANGUARD ACCOUNT
NO. XXXX9050;
TWO HUNDRED NINETY FOUR THOUSAND
ONE HUNDRED THIRTY ONE DOLLARS AND
FIFTY FOUR CENTS ($294,131.54) IN U.S. CURRENCY
FROM HUNTINGTON NATIONAL BANK
ACCOUNT NO. XXXXXXX0448;
ELEVEN THOUSAND NINE HUNDRED FORTY
ONE DOLLARS AND FORTY CENTS ($11,941.40)
IN U.S. CURRENCY FROM HUNTINGTON NATIONAL
BANK ACCOUNT NO. XXXXXXX4140;
NINETEEN THOUSAND FIVE HUNDRED FORTY
TWO DOLLARS AND ONE CENT ($19,542.01)
IN U.S. CURRENCY FROM HUNTINGTON
NATIONAL BANK ACCOUNT NO. XXXXXXX2338;
TWENTY ONE THOUSAND FOUR HUNDRED FIFTY
ONE DOLLARS AND THIRTY CENTS ($21,451.30)
IN U.S. CURRENCY FROM UNITED FINANCIAL
CREDIT UNION ACCOUNT NO. XXXX95-01;
TWENTY ONE THOUSAND EIGHT HUNDRED FORTY
FOUR DOLLARS AND SEVENTY SEVEN CENTS
($21,844.77) IN U.S. CURRENCY FROM UNITED
FINANCIAL CREDIT UNION ACCOUNT NO. XXXX95-04;
FIVE HUNDRED FIFTY SIX THOUSAND SEVENTY
TWO DOLLARS AND NINETY FIVE CENTS ($556,072.95)
IN U.S. CURRENCY FROM UNION BANK ACCOUNT
NO. XXXXX1625;

ALL FUNDS ON DEPOSIT IN SEI PRIVATE TRUST
COMPANY ACCOUNT NO. XXX517;
ALL FUNDS ON DEPOSIT IN SEI PRIVATE
TRUST COMPANY ACCOUNT NO. XXX528;
AND ONE (1) 2016 CHEVROLET SUBURBAN
AUTOMOBILE, VIN NUMBER: 1GNSKHKCXGR443780,

Defendants *in Rem*.

_____/

## COMPLAINT FOR FORFEITURE

NOW COMES Plaintiff, United States of America, by and through its

counsel, MATTHEW SCHNEIDER, United States Attorney for the Eastern

District of Michigan, and GJON JUNCAJ, Assistant United States Attorney, and

states upon information and belief in support of this Civil Complaint for Forfeiture

*in rem* that:

1.     This action is a civil forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A)

and 981(a)(1)(C).

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction over this proceeding pursuant to 28

U.S.C. § 1345 as this action is being commenced by the United States of America

as Plaintiff.

3.     This Court also has original jurisdiction over this action pursuant to 28

U.S.C.§ 1355(a) as an action for forfeiture against the defendants *in rem*.

4.     Venue is proper before this Court pursuant to 28 U.S.C. § 1355(b)(1)(A), as the acts giving rise to the forfeiture of the defendants *in rem* occurred in the Eastern District of Michigan.

## DEFENDANTS *IN REM*

5.     The defendants *in rem* were seized pursuant to judicially authorized federal seizure warrants on or about July 25, 2019. The defendants *in rem* are described as follows:

    a.    One Thousand Seven Hundred Fifty Six Dollars And Three Cents ($1,756.03) In U.S. Currency From Huntington National Bank Account No. XXXXXXX0024;

    b.    Thirty Eight Thousand Four Hundred Eighty Nine Dollars ($38,489.00) In U.S. Currency From Huntington National Bank Account No. XXXXXXX3366;

    c.    Twenty Four Thousand Seven Hundred Thirty Nine Dollars And Seventy Nine Cents ($24,739.79) In U.S. Currency From Huntington National Bank Account No. XXXXXXX8440;

    d.    One Hundred Ninety Two Thousand Four Hundred Thirty Two Dollars And Ninety Nine Cents ($192,432.99) In U.S. Currency From Chemical Bank Account No. XXXXXXX0154;

    e.    Sixty One Thousand Four Hundred Ninety Four Dollars And Forty One Cents ($61,494.41) In U.S. Currency From Michigan State Federal Credit Union Account No. XXXX47-20;

    f.    Twenty Thousand Five Hundred Seventy Three Dollars And Sixty Cents ($20,573.60) From Michigan State Federal Credit Union Account No. XXXX47-80;

g.    Fourteen Thousand Nine Hundred Three Dollars And Twenty Five Cents ($14,903.25) In U.S. Currency From Michigan State University Federal Credit Union Account No. XXXX25-26;

h.    All Funds On Deposit In Michigan State Federal Credit Union Account No. XXXX25-C0;

i.    Four Thousand Six Hundred Ninety Eight Dollars And Five Cents ($4,698.05) In U.S. Currency From Michigan State Federal Credit Union Account No. XXXX25-86;

j.    All Funds On Deposit In TD Ameritrade Account No. XXX-XX2918;

k.    All Funds On Deposit In Vanguard Account No. XXXX9050;

l.    Two Hundred Ninety Four Thousand One Hundred Thirty One Dollars And Fifty Four Cents ($294,131.54) In U.S. Currency From Huntington National Bank Account No. XXXXXX0448;

m.    Eleven Thousand Nine Hundred Forty One Dollars And Forty Cents ($11,941.40) In U.S. Currency From Huntington National Bank Account No. XXXXXXX4140;

n.    Nineteen Thousand Five Hundred Forty Two Dollars And One Cent ($19,542.01) In U.S. Currency From Huntington National Bank Account No. XXXXXXX2338;

o.    Twenty One Thousand Four Hundred Fifty One Dollars And Thirty Cents ($21,451.30) In U.S. Currency From Funds From United Financial Credit Union Account No. XXXX95-01;

p.    Twenty One Thousand Eight Hundred Forty Four Dollars And Seventy Seven Cents ($21,844.77) In U.S. Currency From United Financial Credit Union Account No. XXXX95-04;

q.    Five Hundred Fifty Six Thousand Seventy Two Dollars And Ninety Five Cents ($556,072.95) In U.S. Currency From Union Bank Account No. XXXXXX1625;

r.     All Funds On Deposit In SEI Private Trust Company Account No. XXX517;

s.     All Funds On Deposit In SEI Private Trust Company Account No. XXX528; and

t.     One (1) 2016 Chevrolet Suburban Automobile, VIN Number: 1GNSKHKCXGR443780.

## STATUTORY BASIS FOR CIVIL FORFEITURE

6.     Title 18, United States Code, Section 981(a)(1)(C), provides for the civil

forfeiture to the United States of the following property:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Title 18, United States Code, Section 1956(c)(7)(A), through Title 18, United

States Code, Section 1961(1), incorporates the offense of Wire Fraud (18 U.S.C.

§ 1343) as a specified unlawful activity.

7.     Title 18, United States Code, Section 1343, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. . . . .

8.     Title 18, United States Code, Section 1349 provides:

> Any person who attempts or conspires to commit any offense under
> this chapter shall be subject to the same penalties as those prescribed
> for the offense, the commission of which was the object of the attempt
> or conspiracy.

9.     Title 18, United States Code, Section 1957(a), provides:

> Whoever, in any of the circumstances set forth in subsection (d)
> [including offenses taking place in the United States], knowingly
> engages or attempts to engage in a monetary transaction in criminally
> derived property of a value greater than $10,000 and is derived from
> specified unlawful activity, shall be punished as provided in
> subsection (b).

10.    Title 18, United States Code, Section 1956, prohibits the laundering of

monetary instruments:

> Whoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlawful
> activity, conducts or attempts to conduct such a financial
> transaction which in fact involves the proceeds of specified
> unlawful activity–
>> (A)(i) with the intent to promote the carrying on of specified
>> unlawful activity; or
>> (ii) with intent to engage in conduct constituting a violation of
>> section 7201 or 7206 of the Internal Revenue Code of 1986; or
>> (B) knowing that the transaction is designed in whole or in
>> part-
>> (i) to conceal or disguise the nature, the location, the source,
>> the ownership, or the control of the proceeds of specified
>> unlawful activity; or
>> (ii) to avoid a transaction reporting requirement under State or
>> Federal law, shall be sentenced to a fine of not more than
>> $500,000 or twice the value of the property involved in the

transaction, whichever is greater…

18 U.S.C. § 1956(a)(1).

11.     Title 18, United States Code, Section 981(a)(1)(A) provides for the civil

forfeiture to the United States of, "[a]ny property, real or personal, involved in a

transaction or attempted transaction in violation of section 1956, 1957 or 1960 of

this title, or any property traceable to such property."

18 U.S.C. § 981(a)(1)(A).

## FACTUAL BASIS SUPPORTING FORFEITURE

12.     The defendants *in rem* constitute or are derived from proceeds traceable to

wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud,

in violation of 18 U.S.C. § 1349, and is also property involved in, or traceable to

property involved in, violations of federal money laundering statutes 18 U.S.C.

§§ 1956 and/or 1957. The facts and evidence in support of forfeiture include, but

are not limited to, the following:

    a.     The United States Department of Transportation (USDOT), through

    the Federal Highway Administration (FHWA), funds highway construction

    projects throughout the United States. The federal funds are passed on to the

    various states which then enter into contracts to have the construction work

    performed. Typically, USDOT funds approximately 80% to 90% of the total

    cost of the construction project with the state. The Michigan Department of

Transportation (MDOT) is the contracting agency that is responsible for the administration of federal and state highway construction funds in Michigan.

b.      When MDOT awards a contract, it reserves the right to audit the contractor (and subcontractors) to ensure that they have complied with the contract provisions, as well as with federal and state regulations. The MDOT Office of Commission Audits (MDOT OCA), is an agency within MDOT responsible for conducting such audits.

c.      Surveying Solutions Inc. ("SSI") is a Michigan surveying company incorporated on or about August 17, 2001. At all times relevant to this complaint, SSI's principal place of business was located in Standish, Michigan ("SSI Headquarters"). SSI was a prime contractor or subcontractor for MDOT projects. On or about June 10, 2017, SSI represented to MDOT OCA that its executives were: Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Anthony Thelen, and Adam Ball. SSI also represented that it was owned by Jeffrey Bartlett and Andrew Semenchuk.

d.      SSI's executives used shell companies to qualify as a Disadvantage Business Enterprise. SSI's executives also used shell companies to create fictitious expenses. Beginning as early as 2011 through at least 2018, the fictitious expenses were ultimately paid by MDOT. The submission of fictitious expenses also caused profit payments from MDOT to SSI to be

inflated. Between the fiscal years of 2016 through 2018, SSI was a prime contractor or subcontractor on over 150 MDOT projects involving $29.3 million worth of contracts (of which $25.8 million was federally funded). During this time period alone, 2016 through 2018, $14.3 million was paid to SSI for work as a prime contractor through MDOT. Payments for MDOT projects were made to SSI via electronic funds transfer to a Huntington National Bank account number XXXXXX3633 held by SSI (hereinafter the "SSI Primary Bank Account"). MDOT OCA auditors estimated SSI overbilled MDOT by at least $9.2 million during fiscal years 2016 to 2018.

e.      MDOT contracts with SSI are let in accordance with Title 40 and Chapter 11 of the United States Code, which is commonly known as the Brooks Act. Per the Brooks Act, MDOT is required to negotiate engineering and surveying contracts with the most highly qualified firm. MDOT is required to pay the firm a "fair and reasonable" rate. The payment rate was determined through a calculation of direct labor costs and overhead expenses.

f.      From at least 2016 through at least 2018, MDOT paid SSI an amount that represented direct costs, which included the number of hours SSI employees worked on various jobs, plus an 'indirect cost rate' multiplier which was intended to compensate SSI for certain overhead expenses. The

indirect cost rate was determined, in part, upon representations SSI made during an annual pre-qualification process.

g.      With SSI, as with all MDOT contractors and subcontractors, calculation of the indirect (overhead) rate was governed by "Cost Accounting Standards" set forth in the Federal Acquisition Regulations.     In short, the overhead rate was calculated by dividing annual overhead expenses by the direct labor costs of business for the previous year. Federal Requisition Regulation (FAR) Part 31 controls what costs can be included in overhead.

h.      SSI sent the independent audit to MDOT OCA along with the following records: (i) a prequalification questionnaire, (ii) a Statement of Direct Labor, Fringe Benefits and General Overhead, (iii) Balance Sheet, and (iv) Statement of Income. Once the overhead rate was accepted by MDOT OCA, SSI applied it to invoices sent to MDOT.

i.      SSI invoiced MDOT relative to the amount of hours SSI employees worked on various jobs. SSI submitted the names of employees who worked on a project, the hours worked by the respective employee, and their hourly rate. The above information established a labor cost for a given invoice. SSI multiplied the direct labor cost by the overhead rate. Specifically, MDOT's payments to SSI were determined upon the following formula:

(direct labor costs x overhead rate) x fixed fee. The fixed fee was always 11%. The fixed fee was intended to provide SSI a profit margin.

j.      SSI's executives created shell companies and fraudulent invoices to inflate overhead expenses and drive up the firm's overhead rate. Specifically, SSI executives Jeffrey Bartlett, Andrew Semenchuk, Brian Bartlett, Anthony Thelen, and Adam Ball, and others, utilized three shell companies to inflate overhead in three categories: (i) Southfield IT Group (IT expenses); (ii) 2SI Developments, LLC (equipment and vehicle rental costs); and, (iii) 3SI Building and Leasing, LLC (real property rental expenses.)

**Southfield IT Group**

k.      SSI inflated its overhead rate by asserting it paid a third party vendor, National Elevation Certificates, d/b/a Southfield IT Group ("Southfield IT"), for managed IT services. However, Southfield IT was a shell company created by SSI executives. Southfield IT received 99.2% of its funding from SSI and .7% from SSI's executives. 97% of the money SSI paid to Southfield IT was subsequently transferred into the personal bank accounts of Adam Ball, Sarah Ball, and Tara Semenchuk. 'Southfield IT Group' is a trade name for National Elevation Certificates (NEC), a limited liability company organized in the State of Wyoming at the direction of Adam Ball.

l.      SSI represented to the State of Michigan that during fiscal years 2015, 2016, and 2017 it spent $3,485,649.79 on managed IT services. The company disallowed a portion of those costs, but included $1,575,304.30 within its claimed overhead expenditures. SSI overstated its IT expenses. Based upon a review of Southfield IT's bank account, the company spent less than $145,184.73 on IT services and internet connectivity from January 2016 through February 2019.

m.      SSI represented to MDOT OCA that Southfield IT Group was an unrelated third-party company located in Southfield, Michigan, which provided SSI managed IT services. SSI produced two Managed Storage and IT Service Level Agreements between "Southfield IT Services" and SSI. The two annual agreements covered from February 1, 2016, through February 1, 2018.

n.      The above service agreements did not provide any contact information for Southfield IT Services. Nor were they signed by a Southfield IT Services representative. SSI President Andrew Semenchuk signed the agreement on behalf of SSI.

o.      SSI executive Adam Ball used a company in Wyoming to register Southfield IT with the State of Wyoming. Northwest Registered Agent Service (NRAS) operates in Buffalo, Wyoming, and provides business entity

formation and registered agent services. NRAS filed Articles of

Organization for NEC. On January 6, 2016, SSI's Certified Public

Accountant Stephen Grzesiak registered Southfield IT Group as a trade

name for National Elevation Certificates, LLC.

p.       Defendant i*n rem* One Thousand Seven Hundred Fifty Six Dollars

And Three Cents ($1,756.03) in U.S. Currency was seized from Huntington

National Bank Account No. XXXXXXX0024 held in the name of National

Elevations Certificates, aka, Southfield IT Group. For the time period of

January 2016 through February 2019, the account received 99.2% of its

funding from the SSI Primary Bank Account.

q.       For the same time period, NEC made the following expenditures from

the account:

| DESCRIPTION | AMOUNT | % of Withdrawal |
|---|---|---|
| Adam Ball | $3,955,057.00 | 71% |
| Tara Semenchuk | $776,601.00 | 14% |
| Sarah Ball | $602,674.00 | 11% |
| Martin Chevrolet | $62,920.64 | 1% |
| Network Services Group | $53,118.15 | 1% |
| Internet Service Providers | $52,689.58 | 1% |
| Other Expenditures | $39,377.00 | 1% |
| Grand Total | $5,566,909.97 | 100% |

r.       At least 97% ($5,334,332) of the money SSI paid to NEC d/b/a

Southfield IT Group was passed onto SSI executives and their spouses from

January 2016 through February 2019. No more than three percent was used to cover managed IT services and internet connectivity. The $62,920.64 payment to Martin Chevrolet was for the purchase of the defendant *in rem* 2016 Chevrolet Suburban Automobile, VIN Number: 1GNSKHKCXGR443780 used by Adam Ball's spouse Sarah Ball.

s.      SSI executives Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Thelen, Ball, and others, conspired to operate Southfield IT as a shell company for the purpose of generating overhead expenses and inflating SSI's overhead rate. MDOT OCA estimated that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $1,915,945 as a result of the fraudulent representations regarding IT expenditures.

**3SI Building and Leasing, LLC / 2SI Developments, LLC**

t.      3SI Building and Leasing, LLC (3SI) and 2SI Developments, LLC (2SI) are companies that at all times relevant to this complaint were owned by SSI executives, operated out of SSI's office, and administered by SSI's office manager. The companies hold titles to real and personal property, which were obtained with proceeds received from SSI. 2SI and 3SI leased the property to SSI at rates which exceeded fair market value. SSI included the lease costs in its overhead rate and thereby passed them on to MDOT.

u.      2SI and 3SI did not conduct significant financial transactions with any clients other than SSI. The companies (2SI and 3SI) were funded nearly exclusively by SSI, its executives, or their spouses.

v.      Although applicable federal regulations (FAR Part 31) allow some recovery of rental costs, it prohibits a contractor from recovering payments of inflated rental costs to a commonly controlled entity. Where a contractor rents property from a commonly controlled entity, it may only include in its overhead costs those lease expenses which do not exceed normal costs of ownership, such as depreciation, taxes, insurance, facilities capital cost of money, and maintenance.

w.      For fiscal years 2016 and 2017, SSI claimed lease expenses to 2SI and 3SI, which exceeded the normal costs of ownership. At the time SSI submitted its prequalification package, its president, Andrew Semenchuk certified that all known material transactions or events that have occurred affecting the company's ownership, organization and indirect cost rates had been disclosed. Semenchuk also certified that the proposal only contained allowable costs and that it did not include any costs which were expressly unallowable under applicable cost principles of the FAR of 48 CFR part 31.

*3SI Building and Leasing, LLC*

x.      SSI executives created 3SI and then used the company to charge above-market rents to SSI which were passed along to MDOT via SSI's indirect cost rate. 3SI was organized on or about February 6, 2009, by Jeffrey Bartlett, Brian Bartlett, and Anthony Thelen. In December 2010, Jeffrey Bartlett assigned his ownership interest of 3SI to Brian Bartlett and Anthony Thelen. However, all three of the founding members remained signatories on 3SI's bank account, Huntington National Bank, Account Number XXXXXXX3366, held in the name of 3SI Building and Leasing, LLC. At all relevant times to this complaint, SSI Office Manager Courtney Stodolak was also a signatory on 3SI's bank account.

y.      At all relevant times 3SI owned the real property at which two of SSI's offices are located at. 3SI owns SSI Headquarters in Standish, Michigan (the "Headquarters Building") and a building located in St. Johns, Michigan (the "St. Johns Office.")

z.      3SI purchased the land for SSI Headquarters on February 6, 2009, for $72,000. On August 5, 2009, 3SI gave Citizens Bank a mortgage of $500,000 in exchange for a construction loan. The Arenac County Treasurer has assessed the property to be valued at $454,400. An appraisal conducted by Colliers International valued the property at $198,000. According to

3SI's internal records, the property cost approximately $700,000 to $800,000 to purchase and build. According to SSI's general ledgers, SSI paid 3SI $486,240 to rent the Headquarters Building from 2015 through 2017.

aa.     3SI purchased the St. Johns Office for $111,000 in 2010. According to its general ledgers, SSI paid 3SI $109,780 to lease the St. Johns Office from 2015 through 2017. During 2017, the St. Johns Office was rented for $3,660 per month.

bb.     When SSI included its lease expenditures for the SSI Headquarters and the St. Johns Office in its overhead rate, SSI did not disclose that the landlord was a related party. As set forth above, where a contractor rents property from a commonly controlled entity, it may only include in its overhead costs those lease expenses which do not exceed normal costs of ownership, such as depreciation, taxes, insurance, facilities capital cost of money, and maintenance.

cc.     SSI overbilled MDOT for usage of its Headquarters Building and St. Johns Office. MDOT OCA estimates that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $518,550.58 as a result of the fraudulent representations regarding real property rental costs.

*2SI Developments, LLC*

dd.     2SI was organized in 2004 by Brian Bartlett who listed himself as a member. According to loan documents, Anthony Thelen is also a member of 2SI. 2SI has maintained bank accounts at Huntington National Bank and Chemical Bank. The authorized signatories for both accounts included, among others, Jeffrey Bartlett, Brian Bartlett, and Anthony Thelen. According to records maintained by the Michigan Secretary of State, in 2012 2SI changed its registered agent from Brian Bartlett to SSI's CPA Stephen Grzesiak.

ee.     SSI executives organized 2SI Developments, LLC, and then used the company to charge above-market lease expenses to SSI which were passed along to MDOT via SSI's indirect cost rate. 2SI inflated lease expenses for mobile scanning devices and vehicles.

Mobile Scanners

ff.     SSI provided MDOT with a lease agreement between SSI and 2SI representing that SSI had leased a "Riegl VMX-1HA" and a "Riegl VMX 250" mobile surveying scanner from 2SI. The lease agreement required minimum monthly rental payments of $13,000. Per the lease agreement, the minimum monthly lease payment only entitled SSI to use the scanner "26 days in a fiscal year prior to incurring a daily usage fee for the scanner."

According to its general ledger, in 2017 SSI paid the monthly rental fee ($156,000) and an additional $1,398,045 purportedly for additional usage of the scanner.

gg.    The lease agreement between 2SI and SSI was created to artificially generate overhead expenditures. Similarly, unsupported scanner usage payments were made to further inflate overhead expenses. Because 2SI operated as a shell company for SSI, SSI should have only included in its overhead rates, the actual cost of ownership for the two scanners.

hh.    According to 2SI's general ledgers, its combined cost basis for the scanners was approximately $1,221,188. Along with the mobile lidar acquisition, SSI also procured a GPS receiver at a cost of approximately $25,000. Accordingly, the combined depreciation should have been approximately $249,238 per year (for a five year depreciation period.) As such, SSI should have claimed an overhead cost of approximately $249,238 for the scanners. Rather, SSI paid 2SI $1,554,045 to use the scanners for one year.  MDOT OCA estimates that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $3,670,787.41 as a result of the fraudulent representations regarding mobile scanner expenditures.

<u>Vehicles</u>

ii.     2SI conducted similar transactions with regards to vehicles used within the SSI work-force fleet. 2SI leased vehicles to SSI. Per the five lease agreements for years 2013 through 2017, SSI agreed to pay 2SI $1,700 per month for new vehicles and $1,000 per month for used vehicles. Anthony Thelen signed the lease agreements as member for 2SI. Semenchuk signed on behalf of SSI, as President.

jj.     According to the SSI general ledger, the company paid 2SI $948,300 in 2017 for the lease of 56 vehicles. SSI paid above-market lease rates for use of the vehicles. As an example, one of the 56 vehicles leased in 2017 was a 2014 Chevrolet Silverado Extended Cab pick-up truck. SSI paid 2SI $1,700 per month ($20,400 per year) for the vehicle. SSI began leasing this vehicle from 2SI in 2014. The four year total of these lease payments was $81,600. The MSRP of a 2019 Chevrolet Silverado work truck is $35,310.

kk.     Because SSI leased the 2014 Silverado from 2SI, a commonly controlled entity, it should have only included the actual cost of ownership (taxes, maintenance, cost of money, and depreciation) in its overhead calculation. Depreciation for a $35,310 2014 vehicle would have been approximately $7,062. Additional overhead expense for taxes and maintenance would not justify the total of $20,400 paid to 2SI and included in overhead.

ll.    MDOT OCA estimated that from 2016 through end of fiscal year

2018, MDOT overpaid SSI approximately $2,038,528.70 as a result of the

fraudulent representations regarding vehicle leases.

**Payroll Payment to Spouses**

mm.    SSI also fraudulently billed for payroll expenses involving the spouses

of SSI executives. As an example, for the fiscal year ending December 31,

2017, SSI's payroll included four individuals who are spouses of SSI

executives. Their positions were labeled "project assistants," but their time

was allocated to: marketing, administration, or holiday. According to MDOT

OCA's review of the payroll records, none of the relatives appear to have

assisted on projects.

nn.    The four relatives received end-of-year bonuses totaling $317,600.

While SSI disallowed a significant portion of the related labor ($81,064)

from the indirect cost rate, $130,156 of the remaining labor (which had been

classified as "administrative" or "holiday") and all of the related bonuses

remained in the indirect cost rate for reimbursement.

oo.    In 2017, SSI compensated approximately 98 individuals. That year the

below-identified spouses were among the highest paid employees of SSI.

For fiscal year 2017, spouses of SSI's executives were paid as follows:

| Spouse | Total Hourly Pay | Bonus | Total Compensation |
|---|---|---|---|
| Sarah Ball | $36,420 | $83,000 | $119,420 |
| Jenny Bartlett | $58,080 | $70,800 | $128,880 |
| Celena Thelen | $58,080 | $84,000 | $142,080 |
| Jessica Bartlett | $58,080 | $79,800 | $137,880 |
| | | | |

pp.    Jenny Bartlett and Sarah Ball received the above-described payroll while maintaining employment with other entities. Inconsistent signatures also appear on SSI timesheets for Celena Thelen and Sarah Ball.

qq.    SSI included in its overhead rate payroll for hours which were not worked. Based on a review of SSI's internal accounting records, MDOT OCA estimates that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $1,364,267.85 as a result of the fraudulent representations regarding employment of spouses.

**Criminal Proceeds to Defendants *in rem***

rr.    The SSI Primary Bank Account -- First Merit Bank, now Huntington National Bank (HNB), Account Number XXXXXXX3633 -- was opened in the name of Surveying Solutions, Inc. on or about June 16, 2009. The account received approximately $14,321,114.42 from the State of Michigan from 2016 through 2018 and remained opened through 2019. It is estimated SSI overbilled MDOT by at least $9.2 million during fiscal years 2016 to

2018. The defendants *in rem* constitute property traceable to the fraud proceeds and property involved in the laundering of the fraud proceeds.

ss.      The defendant *in rem* $1,756.03 in U.S. Currency constitutes or is derived from fraud proceeds transferred to the National Elevation Certificates, LLC, a.k.a. Southfield IT Group Huntington National Bank, Account Number XXXXXXX0024 from the SSI Primary Bank Account. Transfers to this account include, but are not limited to: from January 4, 2016, through February 25, 2019, $4,546,844.44 in the form of deposits or transfers drawn on the SSI Primary Bank Account.

tt.      The defendant *in rem* $38,489.00 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Huntington National Bank (HNB), Account Number XXXXXXX3366, held in the name of 3SI Building and Leasing, LLC. Transfers to this account include, but are not limited to: from January 5, 2016, through February 21, 2019, $710,341 in form of deposits or transfers drawn on the SSI Primary Bank Account. During the same period of review, HNB Account No. XXXXXXX3366 also received $120,000 from a Chemical Bank Account  No. XXXXXX0154, held in the name of 2SI Developments, which was also funded from the SSI Primary Bank Account.

uu.    The defendant *in rem* $24,739.79 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Huntington National Bank, Account Number XXXXXXX8440, held in the name of 2SI Developments, LLC. Transfers to this account include, but are not limited to: from January 19, 2016 through February 26, 2019, at least $502,100.00 in deposits or transfers from the SSI Primary Bank Account.

vv.    The defendant *in rem* $192,432.99 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Chemical Bank Account No. XXXXXX0154, held in the name of 2SI Developments, LLC. Transfers to this account include, but are not limited to: at least $7,371,551 from January 4, 2016, through April 3, 2019, in the form of deposits or transfers from the SSI Primary Bank Account. During this period, Chemical Bank Account No. XXXXXX0154 also received $142,000 from HNB Account No. 01388378440, which was also controlled by 2SI. Chemical Bank Account No. XXXXXX0154 funded $2,785,919 in payments to Anthony Thelen and $2,763,919 to Brian Bartlett between the years 2016 and 2019.

ww.   The defendant *in rem* $20,573.60 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Michigan State Federal Credit Union Account No. XXXX47-80, held in the names of Andrew W. Semenchuk and Tara Semenchuk. Transfers to this account include, but are

not limited to: from October 18, 2017, through April 30, 2019, approximately $1,735,000 from the SSI Primary Bank Account. This included a single deposit, on December 19, 2018, of $1,351,854 from the SSI Primary Bank Account.

xx.    The defendant *in rem* $61,494.41 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Michigan State Federal Credit Union Account No. XXXX47-20, held in the names of Andrew W. Semenchuk and Tara Semenchuk. Transfers to this account include, but are not limited to: from October 2017 through April 2019, approximately $517,000 from the SSI Primary Bank Account.

yy.    The defendant *in rem* $14,903.25 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Michigan State University Federal Credit Union (MSU FCU) Account No. XXXX25-26, held in the name of Tara L. Semenchuk Revocable Living Trust, Tara Semenchuk Trustee. This account was funded by other accounts controlled by Andrew and Tara Semenchuk and funded by the SSI Primary Bank Account. Transfers to MSU FCU Account No. XXXX25-26 include, but are not limited to: from October 2017 through April 2019, approximately $215,000 from MSU FCU Account No. XXXX47-80 and $200,000 from MSU FCU Tier Two Account No. XXXX47-20.

zz.     The defendant *in rem* $4,698.05 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Michigan State University Federal Credit Union (MSU FCU) Account No. XXXX25-86, held in the name of Tara L. Semenchuk Revocable Living Trust, Tara Semenchuk Trustee. This account was funded by other accounts controlled by Andrew and Tara Semenchuk and funded by the SSI Primary Bank Account. Transfers to MSU FCU Account No. XXXX25-86 include, but are not limited to: from October 2017 through April 2019, approximately $700,000 from MSU FCU Account No. XXXX25-26.

aaa.    The defendant *in rem* All Funds On Deposit in Michigan State Federal Credit Union Account No. XXXX25-C0 (Five Year Certificate), constitutes or is derived from fraud proceeds. This Five Year Certificate received an initial deposit of $100,000 on July 25, 2018, which originated from MSU FCU Account No. XXXX25-26. As of July 31, 2019, the Five Year Certificate had a balance of $103,006.76.

bbb.    Defendant *in rem* All Funds On Deposit in TD Ameritrade Account No. XXX-XX2918, held in the name of Tara L Semenchuk Trustee FBO Tara L. Semenchuk, constitutes or is derived from fraud proceeds. This account received funding from fraud proceeds originating with the SSI Primary Bank Account and transferred through other accounts described in

this Complaint. This includes, but is not limited to, two checks drawn on MSU FCU Account No. XXXX25-86 in respective sums of $100,000 and $500,000 and deposited to Scottrade account 72437354, now TD Ameritrade Account Number XXX-XX2918 on or about December 8, 2017, and January 18, 2018. As of July 25, 2019, TD Ameritrade Account Number XXX-XX2918 had a balance of approximately $1,677,708.12.

ccc.   Defendant *in rem* All Funds On Deposit In Vanguard Account No. XXXX9050, held in the name of Andrew Semenchuk and Tara Semenchuk as joint tenants with rights of survivorship, constitutes or is derived from fraud proceeds. This account received fraud proceeds originating with the SSI Primary Bank Account. This includes, but is not limited to, from November 8, 2018 through May 21, 2019, four ACH transfers from MSU FCU Account No. XXXX47-80, totaling $1,775,000. As explained in paragraph 12(ww) above, MSU FCU Account No. XXXX47-80 received significant deposits from the SSI Primary Bank Account. As of on or about July 25, 2019, Vanguard Account No. XXXX9050 had a balance of approximately $2,001,078.41.

ddd.   Defendant *in rem* $294,131.54 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Huntington National Bank Account No. XXXXXXX0448, held in the name of Adam R. Ball. This

account was funded directly by the SSI Primary Bank Account as well as other accounts funded by the SSI Primary Bank Account. Transfers to Huntington National Bank Account No. XXXXXXX0448 include, but are not limited to: From December 4, 2018 through February 25, 2019, approximately $994,992.00 from the NEC/Southfield IT Group HNB Account No. XXXXXXX0024. Huntington National Bank Account No. XXXXXXX0448 also received a check deposit in the amount of $194,220.20 and funded by the SSI Primary Bank Account.

eee.   The defendant *in rem* $11,941.40 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Huntington National Bank Account No. XXXXXXX4140, held in the name of Adam and Sarah Ball. This account was funded directly by the SSI Primary Bank Account as well as other accounts funded by the SSI Primary Bank Account. Transfers to Huntington National Bank Account No. XXXXXXX4140 include, but are not limited to: from January 28, 2016 through March 7, 2019, $1,967,170.00 from HNB Account No. XXXXXXX0024, held in the name of NEC/Southfield IT Group. Huntington National Bank Account No. XXXXXXX4140 also received approximately $14,000 directly from the SSI Primary Bank Account.

fff.    The defendant *in rem* $19,542.01 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Huntington National Bank Account No. XXXXXXX2338, held in the name of Adam and Sarah Ball. This account was funded directly by the SSI Primary Bank Account as well as other accounts funded by the SSI Primary Bank Account, including but not limited to: between March 7, 2016 through March 7, 2019, $242,896.00 from HNB Account No. XXXXXXX0024, held in the name of NEC/Southfield IT Group; $415,000.00 from HNB Account No. XXXXXXX0448; $1,029,350.00 from HNB Account No. XXXXXXX4140, held in the names of Adam and Sarah Ball; and approximately $11,800 directly from the SSI Primary Bank Account.

ggg.    The defendant *in rem* $21,451.30 in U.S. Currency constitutes or is derived from fraud proceeds transferred to United Financial Credit Union Account No. XXXX95-01 (primary share account), held in the names of Adam and Sarah Ball as joint owners. The defendant *in rem* $21,844.77 in U.S. Currency constitutes or is derived from fraud proceeds transferred to United Financial Credit Union Account No. XXXX95-04 (checking account), which is also owned by Adam and Sarah Ball. Transfers into United Financial Credit Union Account No. XXXX95-04 included, but was not limited, to: at least $307,000 directly from the SSI Primary Bank

Account and at least $555,724.00 from HNB Account No. 01388480024, held in the name of NEC/Southfield IT Group. In turn, United Financial Credit Union Account No. XXXX95-01 received funding from United Financial Credit Union Account No. XXXX95-04.

hhh.   The defendant *in rem* $556,072.95 in U.S. Currency constitutes or is derived from fraud proceeds transferred to Union Bank Account No. XXXXXX1625, held in the name of Anthony D. Thelen and Celena L. Thelen in trust for (IFT) Anthony and Celena Thelen Living Trust. This account was funded directly by the SSI Primary Bank Account as well as other accounts funded by the SSI Primary Bank Account, including not limited to: between January 1, 2016 through May 7, 2019, approximately $458,474.84 from four check deposits drawn on the SSI Primary Bank Account and $2,785,919 from Chemical Bank Account No. XXXXXX0154, held in the name of 2SI Development, LLC.

iii.   The defendant *in rem* All Funds On Deposit In SEI Private Trust Company Account No. XXX517, held in the name Adam R & Sarah K Ball Trust, constitutes or is derived from fraud proceeds. This account was funded by fraud proceedings originating in the SSI Primary Bank Account and later transferred to other accounts. Transfers funding SEI Private Trust Company Account No. XXX517 include, but are not limited, to: between

October 7, 2016 through January 23, 2019, $1,850,000 from HNB Account

No. XXXXXX4140; $316,000 from United Financial Credit Union Account

No. XXX95; and $206,000 from Chemical Bank Account No.

XXXXXX5888. As of July 26, 2019, SEI Private Trust Company Account

No. XXX517 had a value of $2,583,724.31.

jjj.    The defendant *in rem* All Funds On Deposit In SEI Private Trust

Company Account No. XXX528, held in the name of Anthony & Celena

Thelen Revocable Living Trust, constitutes or is derived from fraud

proceeds. This account was funded by fraud proceedings originating in the

SSI Primary Bank Account and later transferred to other accounts. Transfers

funding SEI Private Trust Company Account No. XXX528 during the

relevant time period of this Complaint, include but are not limited to,

$930,000 from Union Bank Account No. XXXXX01625. As of July 26,

2019, SEI Private Trust Company Account No. XXX528 had a balance of

$2,629,558.65.

kkk.   The defendant *in rem* one (1) 2016 Chevrolet Suburban Automobile,

VIN Number: 1GNSKHKCXGR443780, constitutes or is derived from fraud

proceeds.  On or about August 30, 2016, check number 12026 was drawn on

HNB Account No. XXXXXXX0024, held in the name of National Elevation

Certificates, LLC, aka Southfield IT Group. The check was made payable to

the Martin Chevrolet automobile dealership in Saginaw, Michigan for the amount $62,920.64. The vehicle was subsequently registered to National Elevation Certificates, LLC.

## **CLAIM**

13.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 12 above, including all subparagraphs thereunder.

14.    The defendants *in rem* constitute or are derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and is property involved in, or traceable to property involved in, violations of federal money laundering statutes 18 U.S.C. §§ 1956 and/or 1957, and are, therefore, subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A) and 981(a)(1)(C).

//

//

//

//

//

//

//

## **RELIEF**

WHEREFORE Plaintiff, the United States of America, respectfully requests that warrants for arrest of the defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendants *in rem* be condemned and forfeited to the United States of America.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/*Gjon Juncaj*
GJON JUNCAJ
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0209
Gjon.Juncaj@usdoj.gov
(P62356)

Dated: July 22, 2020

## **VERIFICATION**

I, BRYAN BUTLER, state that I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Complaint for Forfeiture and assert that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents.

Bryan Butler
Special Agent
Federal Bureau of Investigation

Dated: July 22, 2020

35