UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

$1,756.03 IN U.S. CURRENCY FROM
HUNTINGTON NATIONAL BANK
ACCOUNT NO. XXXXXXX0024, *et al.*

          Defendants *in rem*,

v.

ANDREW SEMENCHUK and TARA SEMENCHUK,

          Claimants.

Case No. 1:20-cv-11973

Honorable Thomas L. Ludington
United States District Judge

_____/

**OPINION AND ORDER DENYING CLAIMANTS' MOTION FOR RETURN OF
PROPERTY OR DISISSAL OF CIVIL FORFEITURE COMPLAINT**

TABLE OF CONTENTS

**Introduction** ................................................................................................................. 1

I. **Background** ............................................................................................................... 3

   A. Criminal Case: *United States v. Bartlett*, 23-20676 ............................................ 3

     1. Alleged DBE Scheme .................................................................................... 4

     2. Alleged Overbilling ...................................................................................... 8

     3. Defendants' Alleged Equalization Scheme .................................................. 15

   B. Civil Forfeiture Proceedings ............................................................................. 17

II. **Forfeiture Background and Applicable Procedure** ............................................ 21

III. **Analysis** ................................................................................................................ 27

   A. Preclusive Effect of Criminal Forfeiture Allegations ........................................ 27

   B. Standing .............................................................................................................. 29

   C. Failure to State a Claim ....................................................................................... 30

1. Legal Standard ........................................................................................ 30

2. Analysis ................................................................................................. 32

D. Due Process and Delay ............................................................................ 46

1. Legal Standard ........................................................................................ 46

2. Analysis ................................................................................................. 48

E. Affidavit of Interest Concerning the Semenchuks' Residence ............................ 54

**IV. Conclusion** ....................................................................................... **58**

## Introduction

Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Adam Ball, and Anthony Thelen have been criminally charged with conspiracy to defraud the United States, conspiracy to commit wire fraud, and thirteen counts of wire fraud. All charges stem from the Criminal Defendants' alleged conduct involving Surveying Solutions, Inc. ("SSI"). SSI is a government contractor that profits from completing federally funded construction contracts issued by the Michigan Department of Transportation ("MDOT"). In the criminal case, the Government alleges that, beginning in 2011, the Criminal Defendants conspired to overbill MDOT by misrepresenting SSI's expenses to fraudulently inflate MDOT's reimbursement. Specifically, the Government alleges the Criminal Defendants created three separate companies and misrepresented that these companies were independent from SSI, such that the Criminal Defendants could inflate MDOT's reimbursement for services SSI "purchased" from these commonly-controlled entities. Second, the Government alleges the Criminal Defendants misrepresented to MDOT that their spouses and romantic partners worked for SSI on various awarded contracts to increase SSI's reimbursable payroll expenses. When the dust settled in 2019, the Government alleges the Criminal Defendants defrauded MDOT and the United States of over $12,000,000.

But this case Opinion does not address criminal liability. Instead, this Opinion analyzes the propriety of parallel civil forfeiture proceedings. In 2020, after the FBI seized several assets pursuant to judicially authorized warrants and issued administrative forfeiture proceedings, the Government initiated judicial forfeiture proceedings and filed a civil complaint against twenty Defendant *in rem*, all of which the Government alleges either (1) constitute or can be traced to proceeds of the alleged "overbilling" scheme, or (2) was involved in laundering such proceeds. Several claimants have since alleged ownership interests in the various Defendants *in rem*, and most claimants have agreed to stay the resolution of their claims until the companion criminal proceedings conclude. But Andrew Semenchuk and his wife, Tara, filed a joint motion seeking the return of their purported property or, alternatively, the dismissal of the civil forfeiture claims against their property.

The Semenchuks first argue that the operative civil forfeiture complaint fails to state valid claims. But the complaint includes sufficient factual allegations to support a reasonable belief that the Government can satisfy their respective burdens of proof at trial. The Semenchuks next argue that the prolonged forfeiture proceedings deprived them of due process. But the delay in this case is justified by administrative forfeiture proceedings which the Semenchuks stipulated to adjourn, a complicated companion criminal case, and the Criminal Defendants' own conduct. Moreover, the delay has not prejudiced the Semenchuks, who—until this motion—never pursued available remedies or otherwise contested the Government's claims. Lastly, the Semenchuks ask this Court to "lift" an "affidavit of interest" the Government recorded in the Jackson County, Michigan Register of Deeds, which averred that the Government knew of "conditions or events" that may terminate the Semenchuks' interest in their property in Rives Junction, Michigan. But the Semenchuks have not shown that this property has been restrained, and, more importantly, the

property is not a Defendant in these forfeiture proceedings. For these reasons, as explained in greater detail below, the Semenchuks' motion will be denied.

## I.  Background

As alleged, Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, Adam Ball, and Anthony Thelen defrauded and deprived the federal Government of tens of millions of dollars throughout a decade-long conspiracy. *See generally* ECF No. 71. All five Criminal Defendants are charged with conspiracy to commit wire fraud, conspiracy to defraud the United States, and thirteen counts of wire fraud. *See United States v. Bartlett*, Case No. 1:23-CR-20676 (E.D. Mich. Sept. 25, 2024) [hereinafter the "Second Superseding Indictment"]. The alleged criminal conduct provides helpful context to this parallel civil forfeiture case.

## A.  Criminal Case: *United States v. Bartlett*, 23-20676

All fifteen counts in the pending criminal case arise from the Criminal Defendants' alleged conduct involving Surveying Solutions Inc. (SSI)[1] and related companies, which the Government generally alleges defrauded the United States through transportation contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *Id.*

Relevant to the instant civil forfeiture proceedings, the alleged criminal conduct is best considered in two parts. On the front end, the Government alleges the Criminal Defendants conspired to fraudulently obtain and maintain SSI's certification as a Disadvantaged Business Enterprise to obtain preferential status when bidding on transportation contracts with MDOT. And, on the back end and once awarded a contract, the Government alleges the Criminal Defendants

---

[1] SSI currently advertises itself as Michigan's "premier consulting firm," which specializes in "geospatial/surveying services." *About*, SSI, https://ssi-mi.com/about/ (last accessed Jan. 26, 2025) [https://perma.cc/T2TW-EQVV]. Across three Michigan offices in Standish, St. Johns, and Saginaw, SSI has nearly 120 employees, including professional surveyors, engineers, CAD technicians, and field crew members. *See id.*

fraudulently misrepresented SSI's overhead and labor costs to artificially inflate MDOT's reimbursement, which was largely funded by the United States Department of Transportation.[2]

### 1. Alleged DBE Scheme

In 1983, the United States Department of Transportation (USDOT) created the Disadvantaged Business Enterprise (DBE) Program to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide. The primary . . . objective of the DBE [P]rogram is to level the playing field by providing small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022),   https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise   [https://perma.cc/LAA6-WW9U].   The DBE Program achieves this objective in part by certifying certain businesses as DBEs, based on three qualifying criteria.

First, a DBE must be "small," as defined by the Small Business Administration, 49 C.F.R. § 26.65(a). Second, a DBE must be "at least" 51% owned by a socially or economically disadvantaged individual. "[W]omen, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, [and] Subcontinent Asian Americans" are presumed to be socially and economically disadvantaged. 49 C.F.R. § 26.67(a)(1). And any individual is presumably economically disadvantaged if their personal net worth is less than $2,047,000. 49 C.F.R. § 26.68(a). Third, the DBE applicant must be sufficiently independent from other entities. 49 C.F.R.

---

[2] The Government alleges that "80 to 90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration. ECF No. 1 at PageID.8.

§ 26.71(g). The applicant "must prove that it would be viable as a going concern" without existing arrangements or relationships with other companies, and the applicant "must not regularly use another firm's business-critical vehicles, equipment, machinery, or facilities to provide a product or service under contract[.]" *Id.*

Certification is crucial because "the integrity of [the] DBE [P]rogram depends upon systematic procedures to ensure that only *bona fide* small firms, owned and controlled by socially and economically disadvantaged individual(s), are certified to participate as DBEs in DOT federally assisted programs." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (emphasis added) [https://perma.cc/LAA6-WW9U]. Accordingly, certifying state agencies "must deny [DBE] applications based on sham transactions or false representations, and . . . must decertify DBEs that engage in or make them." 49 C.F.R. § 26.69(g)(2). Importantly, DBEs may receive more contract opportunities once certified because the DBE Program requires state and local transportation agencies that receive federal funding—like MDOT—to set goals to increase DBE participation in the transportation contracting industry. *See* 49 C.F.R. § 26.39.

As this Court has explained in the companion criminal case:

> SSI was a certified DBE before 2011, when SSI was owned by non-party Guy Spreeman. *See* ECF No. 37 at PageID.102; Opinion Letter from Sheryl G. Williams, Acting Associate Director, External Civil Rights Programs Division, U.S. Dept. of Transp., to Franklin Adams, Manager, Business and Administrative Services Division, Mich. Dep't of Transp. (July 27, 2015), https://www.transportation.gov/sites/dot.gov/files/14-0071-Surveying% 20Solutio ns%2C%20Inc.pdf [https://perma.cc/SU3Z-VUBV] [hereinafter USDOT Letter]. But Spreeman passed away in January 2011, and majority ownership of SSI "passed by default" to . . . Jeffrey Bartlett. *Id.* Because [he] was a "non-disadvantaged individual," "MDOT removed SSI's DBE certification in July 2011." *Id.*
>
> On February 25, 2011—just after . . . Jeffrey Bartlett acquired control of SSI—the Government alleges that all [Criminal] Defendants entered into a written "Secret Agreement" that provided that all . . . would be equal owners of the "SSI Group"—

a group of companies including (1) SSI, (2) Southfield IT, (3) 2SI Development, LLC ("2SI"), (4) 3SI Building and Leasing, LLC ("3SI"); and (5) Geo Precision Services, LLC ("Geo"). *See* ECF No. 132 at PageID.1511, 1514, 1520. This Secret Agreement read as follows:

> It is the intent of this agreement that the Buyers and Sellers will each own a 20 percent undivided interest in the above named companies at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock, Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have equal ownership of the companies at the completion of the "Buy In" period.

*Id*. at PageID.1514 (emphasis added). []Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen signed this agreement as the "Sellers," while []Adam Ball and Andrew Semenchuk signed as the "Buyers."[3] *Id*. at PageID.1515.

On June 2, 2011, shortly after signing the alleged 2011 Secret Agreement, [Andrew] Semenchuk—an Asian Pacific Islander and the purported sole owner of Geo— applied to certify Geo as a DBE. *See id*. at PageID.1511, 1513. Geo became DBE certified soon after. *See* USDOT Letter, pg. 2. One year later, in June 2012, Geo purchased 51% of SSI and became its majority owner. *Id*.; *see also* ECF No. 37 at PageID.106–07. In October 2012, "MDOT revoked Geo's DBE status because, after purchasing control of SSI, "Geo was no longer [an] independent business." USDOT Letter, pg. 2. Defendant Semenchuk then dissolved Geo, transferred Geo's assets to SSI, and operated "solely under SSI's name[ ] because [SSI] had better name recognition and a more established credit history." *Id*. So, by December 2012, Semenchuk—rather than Geo as an entity—was SSI's purported majority owner. *Id*. But the Government cites [the] 2011 Secret Agreement and alleges that Semenchuk, in reality, only owned a 20% share of SSI equal to all other [Criminal] Defendants, and "never had ultimate managerial control[.]" ECF No. 132 at PageID.1514.

On April 19, 2013, Semenchuk applied to certify SSI as a DBE. [*Id.*] at PageID.1524. But MDOT denied the application for three main reasons. USDOT Letter, pg. 2–3. First, MDOT concluded that SSI was insufficiently independent because (1) it leased two of its three offices from 3SI, and (2) leased surveying equipment and cars from 2SI when 2SI was partially owned by SSI executives []

---

[3] Less than two months after signing the alleged 2011 Secret Agreement, [Criminal] Defendant Brian Bartlett emailed [Criminal] Defendants Jeffrey Bartlett, Adam Ball, Anthony Thelen, and Andrew Semenchuk with the suggestion that all[] "sit down" and come up with a "better structure to the [SSI Group] org chart" so they could "easi[ly] keep [their] stories straight" when discussing the entities. ECF No. 113-2 at PageID.1138 (sealed). After []Jeffrey Bartlett responded, Brian Bartlett replied to all [Criminal] Defendants, highlighting the need to "keep all of [their] lies straight so [they] don't look like idiots." *Id*. at PageID.1142.

Brian Bartlett and Anthony Thelen. *See id*. When pressed for more information, Semenchuk told MDOT officials—contrary to the 2011 Secret Agreement—that "neither he nor any owners of SSI possessed any ownership interest in" 2SI or 3SI, and that all were "totally separate and distinct entities." *Id*. (emphasis added). But, when MDOT requested tax returns or outside lease agreements to corroborate these claims, Semenchuk refused to comply. *Id*. Second, MDOT "concluded that SSI could not prove by clear and convincing evidence that the transfer of ownership [to Semenchuk] occurred for reasons other than obtaining DBE certification[.]" *Id*., pg. 5. Third, MDOT concluded that [Andrew] Semenchuk had not proven he controlled SSI. *Id*. at pgs. 5–6. Indeed, MDOT noted that SSI may have actually been controlled by []Jeffrey Bartlett, an experienced surveyor who owned SSI just before Semenchuk and Geo's purchase, and owned 48% of SSI after this purchase. *See id*., pg. 6.

On July 27, 2015, the USDOT ultimately reversed MDOT's decision and directed MDOT to certify SSI as a DBE "without delay[.]" *Id*., pg. 7; ECF No. 132 at PageID.1516. The USDOT found "nothing in the [administrative] record" to suggest []Brian Bartlett and Anthony Thelen's dual-status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. USDOT Letter, pg. 4. Although "70% of SSI's business account payments (excluding personnel costs) were paid to [2SI and 3SI], the evidence in the record indicate[d] that the transactions between SSI and 2SI/3SI were arms-length transactions." *Id*. USDOT disagreed with MDOT's conclusion that [Andrew] Semenchuk purchased SSI solely to obtain SSI's DBE certification because, "in [his] words, he purchased SSI because he 'wanted to expand [Geo], eliminate competition, and ... make a profit.'" *Id*., pg. 6. Although []Jeffrey Bartlett owned 48% of SSI and was an experienced surveyor, the USDOT found no evidence that he had "the power or authority to control" SSI after [Andrew] Semenchuk's purchase. *Id*.

. . .

[Andrew] Semenchuk submitted annual "No Change Affidavits" to MDOT to maintain SSI's DBE certification in July of 2016, 2017, and 2018. [ECF No. 132] at PageID.1515. Through these affidavits, Semenchuk affirmed that he—a "socially disadvantaged" individual—was still SSI's majority owner. *See* 49 C.F.R. § 26.83(j). The Government alleges these representations were fraudulent because, per the 2011 Secret Agreement, Semenchuk was not SSI's majority owner and, like all other [Criminal] Defendants, only owned a 20% share of the SSI Group. ECF No. 132 at PageID.1515.

*United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 4642857, at *3–4 (E.D. Mich. Oct. 31, 2024) (citations, quotations, and footnote in original).

Moreover, in August 2014, Jeffrey Bartlett sent Brian Bartlett, Adam Ball, Andrew Semenchuk, and Anthony Thelen an email stating: "Not bad for a bunch of white guys trying to

be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure." Second Superseding Indictment ¶ 28.

Importantly, the Second Superseding Indictment and the Amended Civil Forfeiture Complaint characterize Defendants' alleged efforts to falsely obtain SSI's DBE certification as *overt acts* carried out in furtherance of the Criminal Defendants' alleged conspiracies to commit wire fraud and defraud the United States. *Id.* ¶¶ 22–29; *see also* ECF No. 71 at PageID.324–25 (describing alleged DBE scheme as "part of [the Criminal Defendants'] conspiracy to defraud"), PageID.326 (describing alleged efforts to falsely obtain SSI's DBE certification as done "[t]o further the[] scheme to defraud"). The core of these conspiracy counts is the Criminal Defendants' alleged overbilling.

### 2. Alleged Overbilling

The Government alleges that, *after* MDOT awarded SSI various transportation contracts—regardless of whether each contract was awarded as part of the DBE Program—Defendants artificially created and inflated their expenses subject to MDOT reimbursement by misrepresenting SSI's relationship with other companies and its own employees. *See* Second Superseding Indictment. ¶¶ 20–54. Defendants allegedly orchestrated this scheme in 2011 and, when the dust settled in 2019, had amassed over $12,600,000 in ill-gotten overbilling gains. ECF No. 71 at PageID.327; *see also id.* at PageID.341.

Before discussing Defendants' alleged overbilling in detail, it is necessary to explain how MDOT paid SSI on each awarded contract. Consistent with applicable regulations, MDOT paid SSI by multiplying SSI's "direct labor costs" by an "indirect overhead rate" and then applying a fixed 11% incentive fee, intended to provide SSI with a profit. *See* Second Superseding Indictment ¶¶ 6–8; *see also* ECF No. 71 at PageID.328. SSI's "direct labor costs" were calculated on a

contract-by-contract basis by considering the number of SSI employees who worked on a contract, the number of hours each employee worked, and each employee's hourly rate. *See* Second Superseding Indictment ¶ 6. SSI's "indirect overhead rate," on the other hand, was calculated through an annual "pre-qualification process," which considered SSI's expenses during the prior fiscal year. *Id.* ¶ 7; *see also* ECF No. 71 at PageID.328.

Generally, a contractor may include property rental expenses in its purported overhead rate subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critical to the Government's case, if the contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*, such as "depreciation, taxes . . . and maintenance" for the specific piece of rented property. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF No. 71 at PageID.333–34.

With this context in mind, the Government alleges Defendants conspired to and did defraud the United States through two types of fraudulent misrepresentations and omissions to MDOT. The first concerned SSI's relationship to other companies. The second concerned SSI's relationship to its own employees.

### a.   Commonly Controlled Companies

First, the Government alleges that, despite Defendants' 2011 Secret Agreement and other evidence indicative of common control, Defendants fraudulently represented that the other SSI Group companies—2SI, 3SI, and Southfield IT—were independently controlled and managed such that Defendants could charge MDOT artificially-inflated prices for fictitious rental "costs." *See* Second Superseding Indictment. ¶¶ 30–41; ECF No. 71 at PageID.327–39. Each SSI Group company played a distinct role in this overbilling scheme.

### i. 2SI

2SI was SSI's equipment supplier. According to the Government, Brian Bartlett organized 2SI in 2004. ECF No.71 at PageID.336. He, Jeffrey Bartlett, and Anthony Thelen—all self-purported SSI executives and parties to the 2011 Secret Agreement—were authorized signors on both 2SI's and SSI's bank accounts. *Id.* Further, "2SI . . . did not conduct significant financial transactions with" any other entities, and was "funded nearly exclusively by SSI, its executives, or their spouses." *Id.* at PageID.333; *see also Bartlett*, 2024 WL 4642857, at *5 ("[F]rom January 2016 through February 2019, 99.2% of 2SI's funding came from SSI.").

Yet the Criminal Defendants allegedly told MDOT that 2SI was wholly independent from SSI and fraudulently sought MDOT's full reimbursement for "costs" SSI purportedly "incurred" through agreements to "rent" 2SI's equipment:

> For example, in 2017, SSI leased a mobile surveying scanner from 2SI. Under the terms of the lease agreement, SSI paid 2SI $13,000 per month to rent the scanner. However, SSI could only use the scanner on 26 days throughout the year and owed 2SI $6,000 each day it used the scanner in excess of this limitation. According to a spreadsheet Defendant Semenchuk provided MDOT auditors in 2018, later obtained by the FBI, SSI used the mobile scanner on 40 days throughout 2017, such that SSI should have paid no more than *$84,000* for its excessive use. But SSI billed MDOT *$1,398,045* for its excessive scanner use that year. Aside from this inflated excessive-use bill, the Government alleges that, since 2SI and SSI were commonly controlled, SSI was only entitled to recover the depreciation of the two scanners it rented from 2SI—totaling approximately *$200,000* per year. Yet, SSI billed MDOT *$1,553,045* for the annual use of the rented scanners. In total, MDOT auditors estimate that, as a result of Defendants' fraudulent misrepresentations, MDOT overpaid SSI for mobile-scanner-rentals by $3,893,631 from 2016 through 2018.

*United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 4533554, at *5 (E.D. Mich. Oct. 21, 2024) (internal citations and quotations omitted) (emphasis in original); *accord* ECF No. 71 at PageID.336–38 (alleging "MDOT overpaid SSI approximately $3,670,787.41 as a result of" Defendants' "fraudulent representations regarding mobile scanner expenditures" "from 2016 through the end of fiscal year 2018").

In addition to mobile surveying equipment, SSI also rented company cars from 2SI and, as alleged, similarly inflated these rental costs to fraudulently increase MDOT's reimbursement:

> [F]rom 2013 through 2017, SSI entered into five rental agreements with 2SI for company cars. According to rental agreements, SSI paid 2SI $1,700 per month for new cars and $1,000 per month for used cars. SSI paid 2SI nearly $1,000,000 to rent 56 separate cars throughout FY 2017 alone, and billed MDOT for this cost. But the FBI's investigation revealed that SSI paid above-market[] rates for these cars. For example, the FBI found that one of the 56 cars SSI rented from 2SI was a truck that SSI rented from 2014 through 2018. The four year total of SSI's rental costs for this truck, billed to MDOT, was $81,600. But, according to the Government, the MSRP of the truck is only $35,310. Aside from market value, the Government alleges that, because 2SI and SSI were commonly controlled, SSI was only entitled to reimbursement for the actual cost of each car's ownership. On this point, and as a further example of Defendants' overbilling, the FBI concluded that depreciation for the specific truck would have been approximately $7,062 per year, less than half of the $20,400 SSI included in its overhead rate subject to MDOT reimbursement. In total, MDOT estimates that SSI overbilled MDOT on rental car costs by $2,038,528.70 from 2016 through 2018.

*Bartlett*, 2024 WL 4533554, at *6 (internal citations and quotations omitted); *accord* ECF No. 71 at PageID.338–39 (alleging SSI received "over $2 million" in overpayment for reimbursed vehicle rental expenses through 2SI).

### ii. 3SI

3SI was SSI's landlord and leased SSI its offices and headquarters in St. John's and Standish, Michigan. ECF No. 71 at PageID.335. Criminal Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen co-founded 3SI in 2009 and were, at all relevant times, authorized signors on 3SI's bank account. *Id.* at PageID.334. As with 2SI, 3SI allegedly "did not conduct significant financial transactions with" any other entities, and was "funded nearly exclusively by SSI, its executives, or their spouses." *Id.* at PageID.333; *see also Bartlett*, 2024 WL 4642857, at *6 ("From January 2016 through February 2018, 99.8% of the deposits to 3SI's bank account "were from accounts controlled by SSI or 2SI.").

Yet, as with 2SI, the Government alleges Defendants held 3SI out as independent from SSI to artificially inflate MDOT's reimbursement for SSI's rental expenses:

> Had Defendants disclosed that SSI and 3SI were commonly controlled, the Government notes, they would have only received MDOT's reimbursement for the normal costs of ownership (taxes, depreciation, maintenance). But the Government alleges SSI billed MDOT for the full amount SSI paid 3SI to rent office space in Standish and St John's, Michigan. For example, in 2017, SSI paid 3SI *$217,720* to rent its Standish Headquarters and was reimbursed by MDOT accordingly. But, the FBI estimated that "the normal cost of ownership" for this building in 2017 was just over *$20,538.*

*Bartlett*, 2024 WL 4642857, at *6 (internal citations and quotations omitted) (emphasis in original). "Between the years 2012 through 2018," the Government alleges, "SSI falsely overbilled MDOT for use of its [Standish] Headquarters . . . and St. Johns Office, resulting in an overpayment of over $900,000." ECF No. 71 at PageID.336.

### iii. Southfield IT

As its name suggests, Southfield IT was SSI's IT provider. Southfield IT was the registered trade name for National Elevation Certificates, LLC ("NEC"). *Id.* at PageID.331 (alleging SSI's Certified Public Accountant—Stephan Grzesiak—registered Southfield IT as NEC's trade name in January 2016). Criminal Defendant Ball was identified as a signor on Southfield IT's bank account. *Id.* at PageID.330. The Government alleges that 99.9% of Southfield IT's funding came directly from SSI and the Criminal Defendants personally. *Id*. The Government further alleges that "[o]ver 95% of the money SSI paid to Southfield IT was subsequently transferred into the personal bank accounts" of Adam Ball and his spouse, Sarah, as well as Andrew Semenchuk and his spouse, Tara. *Id.* Illustrative of this common control, the Government identified the following withdraws from Southfield IT's bank account from January 2016 through 2019:

- 12 -

| Description / Withdrawing Party | Percentage of Account Funds Withdrawn from 2016–2019 | Total Amount Withdrawn |
|---|---|---|
| Defendant Adam Ball | 71% | $3,955,057 |
| Tara Semenchuk | 14% | $776,601 |
| Sarah Ball | 11% | $602,674 |
| Martin Chevrolet[4] | 1% | $62,920.64 |
| Network Services Group | 1% | $53,118.15 |
| Internet Service Providers | 1% | $52,689.58 |
| Other Expenditures | 1% | $39,377 |
| **Total:** | **100%** | **$5,566,909.97** |

*See id.* at PageID.332.

Despite this evidence of common control, the Government alleges the Criminal Defendants repeatedly represented to MDOT that Southfield IT was "independent" from SSI and created fictitious contracts and invoices between the two companies to fraudulently inflate their overhead costs, which MDOT then reimbursed.[5] *See id.* at PageID.330-33. For example, SSI billed MDOT

---

[4] "The $62,920.64 payment to Martin Chevrolet was for the purchase of the defendant *in rem* 2016 Chevrolet Automobile," which was thereafter "used by Adam Ball's spouse[,] Sarah Ball." ECF No. 71 at PageID.332.

[5] As this Court noted in a published opinion in the criminal companion case, additional evidence suggests the Criminal Defendants deliberately created Southfield IT to fraudulently create and inflate IT expenses subject to MDOT reimbursement:

[I]nvestigating agents interviewed "Individual A," the owner of Network Services Group (NSG). ECF No. 88-1 at PageID.466 (sealed). Individual A told the FBI that NSG—rather than Southfield IT—provided SSI with IT services as early as 2009. *Id.* Indeed, on December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted all Defendants discussed "forming an IT company for [overhead] reasons" and suggested "all of [NSG']s bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." ECF No. 113-1 at PageID.1007 (sealed). Defendant Jeffrey Bartlett replied, "I Like it!" *Id.* at PageID.1008. Defendant Adam Ball replied, "Sounds good to me. Creative." *Id.* at PageID.1010. Defendant Brian Bartlett replied, "I think it sounds pretty crafty—I like it[.]" *Id.* at PageID.1012. Defendant Thelen replied, "[s]ounds legit." *Id.* at PageID.1013. In accordance with these emails, Individual A reported that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

a total of *$1,575,304.30* for IT services it purchased from Southfield IT throughout FY 2015, 2016, and 2017. *Id.* at PageID.330. But the Government alleges that SSI actually spent "less than *$145,184.73* on IT services" during this timeframe. *Id.* (emphasis added). The Government ultimately estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 "as a result of [the Criminal Defendants'] fraudulent representations regarding IT expenditures. *Id.* at PageID.333

### b.  Direct Labor Costs and Payroll Representations

In addition to fraudulently misrepresenting SSI's relationship to 2SI, 3SI, and Southfield IT to artificially inflate SSI's reimbursable *overhead rate*, the Government alleges the Criminal Defendants—Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, Anthony Thelen, and Adam Ball—artificially inflated SSIs reimbursable *direct labor costs* by billing MDOT for work their spouses and romantic partners never performed. *Id.* at PageID.339–41.

As explained in the companion criminal case:

> On September 25, 2015, []Jeffrey Bartlett sent[] Brian Bartlett, Anthony Thelen, Adam Ball, and Andrew Semenchuk an email entitled "Our Hours," which stated the[y] would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate*." In addition to suggesting [they] "come up with additional scanner charges" from 2SI, []Ball asked the group whether [they] could "raise hours/wages for [their] wives." []Jeffrey Bartlett responded that [they] "may have to give [their wives] bigger raises to *help out on overhead*[.]"And, in May 2016, [Andrew] Semenchuk emailed all [Criminal] Defendants suggesting they represent to MDOT that their wives "performed marketing duties" because [the Criminal Defendants] gave their wives "large bonuses" which "need[ed] to [be] justif[ied]."

*Bartlett*, 2024 WL 4533554, at *8 (internal citations omitted) (emphasis in original).

In accordance with these emails, SSI's 2017 payroll allegedly reflected that four of the five Criminal Defendants' spouses—Sarah Ball, Jenny Bartlett, Celena Thelen, and Jessica Bartlett—

---

*Bartlett*, 2024 WL 4533554, at *7.

worked on various MDOT contracts as "project assistants." ECF No. 71 at PageID.340. But MDOT forensic auditors concluded that "none" of these spouses assisted on projects, and the Government alleges several spouses had other full time jobs. *Id.* Yet these spouses were among the highest-paid "employees" at SSI, and collectively received hundreds of thousands of dollars in compensation for work they did not perform, subject to MDOT reimbursement. *Id.* at PageID.339– 40. In FY 2017 alone, the Criminal Defendant's partners and spouses were compensated as follows:

| Spouse/Partner | Hourly Pay | Bonus | Total Compensation |
|---|---|---|---|
| Sarah Ball (Adam Ball) | $36,420 | $83,000 | $119,420 |
| Jenny Saxman (Jeffrey Bartlett) | $58,080 | $70,800 | $128,880 |
| Celena Thelen (Anthony Thelen) | $58,080 | $84,000 | $142,080 |
| Jessica Bartlett (Brian Bartlett) | $58,080 | $79,800 | $137,880 |

*See id.* at PageID.340. The Government ultimately alleges that, "[f]rom 2012 through 2018, MDOT overpaid SSI over $1,800,000 as a result of fraudulent representation[s] regarding the employment of [the Criminal Defendants'] partner[s] [and] spouses." *Id.*

### 3. Defendants' Alleged Equalization Scheme

But where did the alleged $12,600,000 in overbilling proceeds go? According to the Government, these proceeds were funneled directly and indirectly to various personal bank accounts owned by the Criminal Defendants and their spouses. Indeed, the Government alleges the Criminal Defendants intentionally "equalized" the income of all SSI Group companies—SSI, 2SI, 3SI, and Southfield IT—such that each received an equal share of the Groups' net income— including all alleged overbilling proceeds—at the end of each fiscal year. ECF No. 71 at PageID.324. As explained in the companion criminal case:

[T]he Government alleges [the Criminal] Defendants would offer fictitious "loans" to one another and take fake loans from the SSI Group entities, with the expectation that the loans would never be paid.[6] *Id.*

For example, in December 2015, Sandy Slominski, a CPA with "Folds & Co., P.C. Certified Public Accounts" wrote a memo to [Andrew] Semenchuk and SSI entitled "2015 Year End Tax Planning" which outlined a "list" of the following "actions to take before the end of the year:"

1. Have SSI take out a loan of $600,000 from the line of credit.
2. Write a check from SSI to 2SI for $438,000
3. Write a check from SSI to [Southfield IT] for $411,110.95
4. Pay bonuses to SSI managers (see attached schedule). Gross bonus amount equals $765,197.00.
5. Write two checks for $205,000 from 2SI—one each to [Anthony Thelen] and [Brian Bartlett] for distributions.
6. Write a check from [Southfield IT] to []Adam [Ball] for $288,000 for distributions.
7. Write a check for $130,000 to []Jeff Bartlett from 2SI as a loan.
8. Write a check for $133,000 to []Andy Semenchuk from [Southfield IT] as a loan.

ECF No. 113-1 at PageID.1023 (sealed). And CPA Slominski emphasized "[t]he important point is that each of your 'cash after tax' are close to equal.'" *Id.*

---

[6] Evidence also suggests the Criminal Defendants used fake "loans" to keep their "books clean" and avoid administrative or criminal investigation. In October 2016, SSI's office manager emailed all Criminal Defendants with a "breakdown" of SSI, 2SI, 3SI, and Southfield IT's bank accounts. ECF No. 113-1 at PageID.1032 (sealed). [Adam] Ball responded, "[s]hould we take some out of [SSI's] account again? Probably a little risky keeping that much in there[.]" *Id.* [Andrew] Semenchuk replied:

> I think what we should do, is make a payment to 2SI for some days []of scanner use [s]o Brian [Bartlett] and [Anthony Thelen] [c]an take their loans/distributions from 2[SI] and do an IT payment as well (for Adam [Ball]) to [Southfield IT].
>
> This method keeps the SSI books clean. Jeff [Bartlett] and I will take loans from SSI. At the end of the year, Jeff and I will have to pay our loans back . . . [a]nd then [can] take the loans from 2SI/[Southfield IT] like we did last year.
>
> I know it is complicated and paranoia, but [] stay with the flow (clean books) . . . [o]r just all take loans from SSI and sort it out later…

*Id.* at PageID.1031.

The Second Superseding Indictment also alleges that, on December 28, 2017,[] Jeffrey Bartlett sent an email to "SSI's accountant" titled "SSI Equalization[]" stating:

> I guess I personally was thinking more on the lines of getting "loans" from SSI in the 2017 year *that we know would never be paid back* and keep us all equal from year to year.

ECF No. 132 at PageID.1521 (emphasis added). Three minutes later, Semenchuk sent Ball, Thelen, and Brian Bartlett an email titled "Update & Question" stating:

> [E]xactly bonuses to keep me under $350 and the rest *loans that will never be paid back*.[]

*Id.* (emphasis added). Five minutes later, Ball responded:

> I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did not show monster loans on the books to the owners for DBE.

*Id.* Nine minutes later, Brian Bartlett responded:

> I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and [Southfield IT] because they are maxed out. Then we would do so after the first of the year for Adam [Ball], Brian [Bartlett], [Anthony Thelen] and Jeff [Bartlett]. Andy [Semenchuk] would get loans from SSI then . . .

*Id*. at PageID.1522.

*Bartlett*, 2024 WL 4533554, at *8 (citations, footnote, and emphasis in original).

### B.  Civil Forfeiture Proceedings

Onward. Understanding the underlying criminal allegations is crucial to understanding the instant civil forfeiture proceedings. Indeed, the criminal and civil forfeiture proceedings are two branches on the same tree and accordingly share the same trunk.

- 17 -

In 2018, MDOT conducted a routine audit of SSI's rates, which revealed a fraction of the alleged fraudulent conduct detailed above.[7] *See id.* and *10.   Based on information uncovered through MDOT's audit and a subsequent independent internal investigation, the FBI obtained warrants to search three SSI offices and the personal residences of Brian Bartlett, Adam Ball, and Andrew Semenchuk. *See Bartlett*, 2024 WL 4533554, at *9–10. The FBI executed the search warrants on July 25, 2019. *Id.* at *11. Stemming from these *searches*, the FBI sought warrants to *seize* funds from eighteen bank accounts belonging to the Criminal Defendants, their spouses, 2SI, 3SI, and Southfield IT. *See In Re: Seizure Warrant*, Case No. 1:19-mc-51090. The FBI also sought a warrant to seize the 2016 Chevrolet Suburban registered in Southfield IT's name. *Id.*, ECF No. 1 (sealed). Although each application sought to seize a separate "target asset," all applications incorporated the same *45-page* supporting affidavit—written by FBI Special Agent Bryan Butler— which thoroughly explained the Criminal Defendants' alleged overbilling scheme and how all target assets were traceable to this scheme and SSI's primary bank account. *See, e.g.*, *id.*, ECF No. 3 at PageID.51–96 (sealed). Magistrate Judge Patricia T. Morris concluded Agent Butler's affidavits proffered probable cause that the "target assets" were subject to forfeiture and accordingly issued warrants to seize all 19 target assets on July 25, 2019.

---

[7] This 2018 MDOT audit prompted administrative proceedings, too. Indeed, based on its own internal conclusion that SSI was overbilling MDOT by creating and inflating artificial costs, MDOT initially suspended SSI from participating in or procuring government contracts, but reinstated SSI after it agreed to pay MDOT a $3,564,031.54 settlement. *United States v. Bartlett*, 731 F. Supp. 3d 836, 848 (E.D. Mich. 2024), *aff'd sub nom. United States v. Semenchuk*, No. 24-1405, 2024 WL 4751486 (6th Cir. Oct. 18, 2024).  And although *SSI* can now participate in the contracting industry, the *individual Criminal Defendants* cannot because the USDOT separately suspended them from "being a participant or principal" in federally funded contracts until the criminal proceedings against them are resolved. *See id.*

The Government initiated judicial forfeiture proceedings by filing a civil forfeiture complaint on July 23, 2020.[8] ECF No. 1. The civil forfeiture proceedings were sealed the next day, ECF No. 2, and remained sealed until March 7, 2024, ECF No. 4. The Government then filed an Amended Complaint on May 20, 2024, identifying twenty Defendants *in rem*, nineteen of which were seized pursuant to the FBI's warrants in July 2019.[9] ECF No. 71.

Importantly, the Government proceeds under *two* distinct theories of forfeiture: (1) that the Defendants *in rem* constitute or were derived from *proceeds* traceable to the alleged wire fraud and conspiracy to commit wire fraud, 18 U.S.C. § 983(a)(1)(C); and (2) that the Defendants *in rem* were used to *launder* such proceeds, 18 U.S.C. § 981(a)(1)(A). *Id.* at PageID.317, 320–22. The following table describes each Defendant *in rem*, as well as all claimants who have asserted ownership interests since seizure:

| Defendant *in Rem* | Description | Claimant(s) |
|---|---|---|
| 1 | **$1,756.03** from Southfield IT's Bank Account (Huntington National Bank Account No. XXXXXXX0024) | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) NEC/Southfield IT (ECF No. 70) |
| 2 | **$38,489.00** from 3SI's Bank Account (Huntington National Bank Account No. XXXXXXX3366) | Anthony Thelen (ECF No. 56) Brian Bartlett (ECF No. 59) Jeffrey Bartlett (ECF No. 62) 3SI (ECF Nos. 61; 67) |
| 3 | **$24,739.79** from 2SI's Primary Bank Account (Huntington National Bank Account No. XXXXXXX8440) | Anthony Thelen (ECF No. 56) Brian Bartlett (ECF No. 59) Jeffrey Bartlett (ECF No. 62) 2SI (ECF Nos. 60; 64) |
| 4 | **$192,432.99** from 2SI's Secondary Bank Account (Chemical Bank Account No. XXXXXXX0154) | Anthony Thelen (ECF No. 56) Brian Bartlett (ECF No. 59) Jeffrey Bartlett (ECF No. 62) |

---

[8] Initially, these forfeiture proceedings were filed in the Eastern District of Michigan's Southern Division and assigned to District Judge Laurie Michelson. *See* ECF Nos. 1 at PageID.1; 2 at PageID.39. But, after the companion criminal proceedings were filed in the Northern Division in 2023, this civil forfeiture case was reassigned to the undersigned. *See* ECF No. 55.

[9] Defendant *in rem* 4—$192,432.99 from 2SI's Secondary Bank Account—was seemingly not seized pursuant to the FBI's July 2019 warrants. The Parties have not yet explained how this was Defendant *in rem* was discovered or when it was seized.

| | | 2SI (ECF No. 60; 64) |
|---|---|---|
| 5 | **$20,573.60** from one of Andrew and Tara Semenchuk's joint accounts (Michigan State Federal Credit Union Account No. XXXX47-80) | Andrew Semenchuk (ECF No. 48) Tara Semenchuk (ECF No. 47) |
| 6 | **$61,494.41** from a second joint Semenchuk account (Michigan State Federal Credit Union Account No. XXXX47-20) | Andrew Semenchuk (ECF No. 48) Tara Semenchuk (ECF No. 47) |
| 7 | **$14,903.25** from Tara Semenchuk's Revocable Living Trust (Michigan State University Federal Credit Union Account No. XXXX25-26) | Tara Semenchuk (ECF No. 47) |
| 8 | **$4,698.05** from Tara Semenchuk's Second Revocable Living Trust (Michigan State Federal Credit Union Account No. XXXX25-86) | Tara Semenchuk (ECF No. 47) |
| 9 | **All funds** in a Five Year Certificate initially funded by Tara Semenchuk's trust (Federal Credit Union Account No. XXXX25-C0) | Tara Semenchuk (ECF No. 47) |
| 10 | **All funds** in Tara Semenchuk's personal bank account (TD Ameritrade Account No. XXX-XX2918—now Charles Schwab Account No. XXXX-0476)[10] | Tara Semenchuk (ECF No. 47) |
| 11 | **All funds** in a third joint Semenchuk account (Vanguard Account No. XXXX9050)[11] | Andrew Semenchuk (ECF No. 48) Tara Semenchuk (ECF No. 47) |
| 12 | **$294,131.54** from Adam Ball's bank account (Huntington National Bank Account No. XXXXXX0448) | Adam Ball (ECF No. 53) |
| 13 | **$11,941.40** from a joint account owned by Adam and Sarah Ball (Huntington National Bank Account No. XXXXXXX4140) | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) |
| 14 | **$19,542.01** from Sarah Ball's bank account (Huntington National Bank Account No. XXXXXXX2338) | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) |
| 15 | **$21,451.30** from a joint account owned by Adam and Sarah Ball (United Financial Credit Union Account No. XXXX95-01) | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) |
| 16 | **$21,844.77** from Adam and Sarah Ball's joint checking account (United Financial Credit Union Account No. XXXX95-04) | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) |

---

[10] Tara Semenchuk alleges this Defendant *in rem* as a "trust" containing $1,677,708.12 at the time of seizure. ECF No. 47 at PageID.217.

[11] Andrew and Tara Semenchuk allege this account contained $2,001,078.41. ECF Nos. 47 at PageID.217; 48 at PageID.228.

| 17 | **$556,072.95** from an account in trust (IFT) for Anthony and Celena Thelen's Living Trust (Union Bank Account No. XXXXXX1625) | Anthony Thelen (ECF No. 56) Celena Thelen (ECF No. 57) |
|----|----|----|
| 18 | **All funds** in Adam and Sarah Ball's trust (SEI Private Trust Company Account No. XXX517) | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) |
| 19 | **All funds** in Anthony and Celena Thelen's trust (SEI Private Trust Company Account No. XXX528) | Anthony Thelen (ECF No. 56) Celena Thelen (ECF No. 57) |
| 20 | **A 2016 Chevrolet Suburban**, VIN 1GNSKHKCXGR443780, purchased on August 30, 2016, registered in Southfield IT's name, and primarily used by Sarah Ball | Adam Ball (ECF No. 53) Sarah Ball (ECF No. 54) NEC/Southfield IT (ECF No. 70) |

*See* ECF No. 71 at PageID.341–50.

Brian Bartlett, 2SI, 3SI, Anthony Thelen, and Celena Thelen stipulated to stay the resolution of their claims to these assets pending the resolution of the companion criminal case. ECF No. 75. On July 31, 2024, Claimants Andrew and Tara Semenchuk (the "Semenchuks") filed a motion seeking the return of their property or, alternatively, the dismissal of the Amended Civil Forfeiture Complaint in its entirety. ECF No. 79. As shown in the table above, the Semenchuks collectively claim ownership in Defendants *in rem* 5 through 11—seven of their personal bank accounts, which they claim include "virtually all" of their non-retirement assets and total "more than $4.7 million" considering investment gains since seizure. *Id.* at PageID.387–88. The Government responded to the Semenchuks' motion on August 30, 2024, ECF No. 80, and the Semenchuks replied on September 13, 2024. ECF No. 81.

## II.  Forfeiture Background and Applicable Procedure

"The concept of forfeiture, punishing profit and property of criminal conduct, is Biblical." *Novak v. Federspiel*, 646 F. Supp. 3d 878, 885 (E.D. Mich. 2022) (citing *Exodus* 21:28 ("If an ox gore a man or woman, and they die, he shall be stoned: and his flesh shall not be eaten, but the owner of the ox shall be quit.")). Although evolved from these ancient roots, modern forfeiture

law continues to rest on the "legal fiction" that inanimate objects can be culpable or guilty. *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581 (1931). As applied today, this fiction is equally controversial as it is confusing. *See, e.g.*, David Benjamin Ross, *Civil Forfeiture: A Fiction That Offends Due Process*, 13 REGENT U. L. REV. 259 (2001) (arguing that modern forfeiture is a "machinery replete with irresolvable conflicts" which offends Fourteenth Amendment due process); Christine A. Budasoff, *Modern Civil Forfeiture is Unconstitutional*, 23 TEX. REV. L. & POL. 467 (2019) (same); *Leonard v. Texas*, 580 U.S. 1178 (2017) (Thomas, J., statement respecting the denial of certiorari) ("I am skeptical that this historical practice is capable of sustaining, as a constitutional matters, the contours of modern practice.")

Confusingly, forfeiture proceedings can be either administrative or judicial. Administrative forfeiture proceedings can become judicial forfeiture proceedings. Judicial forfeiture can be criminal or civil.  And at any point throughout proceedings, some combination of administrative, criminal, or civil standards may apply.

Although not required in every case, administrative forfeiture proceedings are overseen by the seizing agency and provide an opportunity for "the [G]overnment and private parties to resolve their forfeiture-related disputes" before seeking court intervention. *United States v. Ninety Three Firearms*, 330 F.3d 414, 422 (6th Cir. 2003) (quoting *United States v. Twelve Firearms*, 16 F. Supp. 2d 738, 741 (S.D. Tex. 1998), *aff'd*, 54 F. App'x 405 (5th Cir. 2002)); *see also United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 566 (1983) (noting "administrative proceedings are less formal and expensive than judicial forfeiture proceedings"). But only certain assets are subject to administrative forfeiture. Real property can never be forfeited administratively. 18 U.S.C. § 985. Judicial forfeiture proceedings must be initiated, instead. *Id.*  "Monetary instruments"—like currency and hard cash—can always be

forfeited administratively. *See* 31 U.S.C. 5312(a)(3). But the kinds of assets seized here—personal property and funds from bank accounts—can only be forfeited administratively if valued at less than or equal to $500,000. *See* 19 U.S.C. § 1607; *see also* U.S. DEP'T OF JUST., ASSET FORFEITURE POLICY MANUAL, 6-3, n.5 (2025) (noting funds in bank accounts are not "monetary instruments" as defined by federal statute, such that the "$500,000 cap on administrative forfeiture" applies).

If the seizing agency initiates administrative forfeiture proceedings and provides appropriate notice, *see* 18 U.S.C. § 983(a)(1), "any person claiming" the seized property "may file a claim" with the seizing agency or on www.forfiture.gov no later than the deadline provided in the agency's notice. *See* 18 U.S.C. § 983(a)(2); U.S. DEP'T OF JUST., ASSET FORFEITURE POLICY MANUAL, 6.C.1 (2025). Doing so, however, triggers the Government to initiate judicial forfeiture proceedings—by either filing a *civil* forfeiture complaint or *criminal* indictment containing forfeiture allegations—within 90 days unless the Government receives a court-ordered extension for good cause. 18 U.S.C. § 983(a)(3)(A). Indeed, the Government may file a civil forfeiture complaint *and* include parallel forfeiture allegations in a companion criminal indictment. *See* 18 U.S.C. § 983(a)(3)(C) ("[I]n addition to[] filing a civil forfeiture complaint, the Government may include a forfeiture allegation in a criminal indictment.")  Likely in light of this confusion, the Parties squabble about the precise relief the Semenchuks seek, and whether this relief is procedurally proper.

All agree that the Semenchuks cannot obtain the return of their purported property through the Federal Rules of *Criminal* Procedure. *See* ECF No. 81 at PageID.499. In other circumstances, a "person aggrieved" by a seizure can seek the return of their property under Criminal Rule 41(g). *See* FED. R. CRIM. P. 41(g).  But "once a party receives notice of forfeiture proceedings, Rule 41(g) is no longer an accessible remedy." *United States v. One Million Seven Hundred Thousand Dollars*

*($1,700,000.00) in U.S. Currency*, 545 F. Supp. 2d 645, 653 (E.D. Mich. 2008). Indeed, "[a]fter the [G]overnment initiates forfeiture proceedings and notifies a claimant of the proceedings, a claimant may no longer use Rule 41[g], but instead must submit to the statutory proceedings governing civil forfeiture proceedings." *United States v. One 1974 Learjet 24D, Serial No. 24D-290, Mexican Registration XA-RMF*, 191 F.3d 668, 673 (6th Cir. 1999).

But the Parties dispute what these "statutory proceedings" include and permit. The Semenchuks contend they can seek the return of their property without seeking the additional dismissal of the respective civil forfeiture claims. *See* ECF No. 79 at PageID.418. The Government disagrees and argues that, at this juncture, the Semenchuks can only retrieve their property if the civil forfeiture claims against these Defendants *in rem* are dismissed. *See id.*; ECF No. 80 at PageID.462. Neither side is quite right.

These civil forfeiture proceedings are "governed jointly" by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and the Federal Rules of Civil Procedure. *United States v. Eighty-Two Thousand Three Hundred Dollars ($82,300) in U.S. Currency*, No. 2:18-CV-11848, 2019 WL 1112390, at *2 (E.D. Mich. Mar. 11, 2019); *see also* 18 U.S.C. § 983(a)(3)(A), (a)(4)(A). Supplemental Rule G ("Rule G") "governs forfeiture action[s]" and, to the extent Rule G "does not address an issue," the Federal Rules of Civil Procedure fill the gaps, so long as the gap-filling Civil Rules are consistent with Rule G. Supplemental Rule G(1); *see also* SUPP. R. FED. R. CIV. P. A(1)(B) (noting the Civil Rules apply to forfeiture actions "except to the extent they are inconsistent" with Rule G); *see also U.S. v. Contents of* Accounts, 629 F.3d 601, 606 (6th Cir. 2011) ("[C]ivil forfeiture actions . . . are governed by the Supplemental Rules and, to the extent they are not 'inconsistent,' the Federal Rules of Civil Procedure.") Rule G "creates" two—and only two—relevant procedural paths for claimants like the Semenchuks who

want their purported property returned after civil forfeiture proceedings have begun but before a final order of forfeiture. *See United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 348 (6th Cir. 2017).

First, without seeking dismissal, a claimant can *petition* for the return or release of their property under 18 U.S.C. §983(f). Supplemental Rule G(8)(d). But these petitions must be presented to the seizing government agency or official before they are filed with the Court. 18 U.S.C. § 983(f)(3)(A) (allowing claimants to petition the court if, having first petitioned the appropriate government official, their property has not been released or returned in 15 days). And courts should only grant such petitions if:

> (1) the claimant has a valid possessory interest in the seized property;
> (2) the claimant has sufficient community ties to ensure the property will be available at trial;
> (3) the Government's continued possession of the property causes "substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless;
> (4) this hardship "outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred" pretrial; and
> (5) the seized property is *not*
> > (A) contraband, currency, or electronic funds, unless assets of a legitimate business;
> > (B) "to be used as evidence of a violation of the law
> > (C) "particularly suited for use in illegal activities," or
> > (D) "likely to be used to commit additional criminal acts if returned to the claimant."

*See* 18 U.S.C. §983(f)(1) (incorporating § 983(f)(8)). Although the Semenchuks seek the return of their purported property, they did not avail themselves of this petition process,[12] and their "motion"

---

[12] The Semenchuks contend that they cannot petition the Government for the return of their property in accordance with Rule G and incorporated § 983(f) because their seized bank accounts were "immediately liquidated and turned over" from the FBI to the United States Attorney's Office. ECF No. 79 at PageID.395. But nothing in Rule G nor incorporated § 983(f) precludes a petition under these circumstances. Indeed, the Semenchuks are seemingly free to file a petition seeking the return of their purported property with the "appropriate official"—either the seizing FBI Agent or the Assistant United States Attorney—at any time.

improperly seeking this relief for the first time in federal court does not even attempt to argue that the return of their property is warranted under the factors outlined in 18 U.S.C. § 983(f). *See generally* ECF Nos. 79; 81.

This leaves the Semenchuks with one viable procedural path for their requested relief: a motion to dismiss. In addition to the § 983(f) petition process—which the Semenchuks have not yet availed themselves of—Rule G expressly allows claimants with standing to "move to dismiss the" civil forfeiture complaint under Civil "Rule 12(b)." Supplemental Rule G(8)(b). But the Semenchuks only seek dismissal in the alternative, and argue they can seek the "immediate release" of their purported property without also seeking to dismiss the underlying civil forfeiture complaint. *See* ECF No. 79 at PageID.383, 418. Binding Sixth Circuit precedent compels the opposite conclusion.

Like here, in *United States v. Contents of Accounts*, the Government initiated civil forfeiture proceedings parallel to a criminal case involving alleged mail and wire fraud. 629 F.3d 601, 603–04 (6th Cir. 2011). The criminal defendants filed a motion in the civil forfeiture case which sought dismissal or, alternatively, the return of their property by way of a Civil Rule 65 injunction. *Id.* at 603. The district court denied the defendants' request for the return of property and concluded Supplemental Rule G and § 983(f)'s explicit petition process trumped Civil Rule 65's inconsistent provisions concerning injunctive relief, such that civil forfeiture claimants cannot circumvent Rule G by seeking the return of their property as a form of equitable relief. *Id.* at 605. The Sixth Circuit agreed. *Id.* at 606–09 (noting (1) "it is only where Rule G does not address an issue that the Civil Rules set the procedure governing forfeiture actions," (2) Rule G expressly requires claimants to seek the return of their property through the petition process outlined in § 8983(f), and (3) Civil Rule 65 is inconsistent with this process because it provides much broader

relief). Indeed, the Sixth Circuit held that Rule G's petition process is "*the* mechanism" through which claimants can seek the return of their property seized subject to forfeiture. *Id.* at 608 (emphasis added). Otherwise, the Sixth Circuit held, claimants must seek dismissal of the civil forfeiture complaint under Civil Rule 12, as expressly authorized in Rule G(8)(b). *Id.* at 609.

True, unlike the claimants in *Contents of Accounts*, the Semenchuks do not explicitly invoke Civil Rule 65 nor do they expressly request an injunction. *See* ECF No. 79. But, practically, the Semenchuks seek injunctive relief by requesting the "immediate release and return" of their property outside the express petition procedures outlined in Rule G. *Contents of Accounts* precludes this. Because the Semenchuks have not petitioned the Government for the return of their property, the only way they can obtain their requested relief at this juncture is through a motion to dismiss under Civil Rule 12(b). So this Court will construe the Semenchuks' motion—which seeks dismissal in the alternative—as a motion to dismiss the Amended Civil Forfeiture Complaint.

### III. Analysis

#### A. Preclusive Effect of Criminal Forfeiture Allegations

Before turning to the merits of the Semenchuks' motion, this Court must address the Government's argument that the merits should not be considered. The Government argues that the Semenchuks' motion is barred because the operative indictment in the companion *criminal* case contains analogous forfeiture allegations. ECF No. 80 at PageID.450. Specifically, the Government argues that, under Criminal Rule 32.2(b)(1), "Andrew Semenchuk must wait until a verdict is reached" in his *criminal* case before contesting the *civil* forfeiture proceedings and, relatedly, Tara Semenchuk's attempted "intervention" is "expressly prohibited by 21 U.S.C. § 853(k)." *Id.* This argument is misplaced and unsupported.

Both Criminal Rule 32.2(b)(1) and 21 U.S.C. § 853(k) concern *criminal*—not *civil*—forfeiture. Rule 32.2(b)(1) provides that, in a criminal case containing forfeiture allegations, the Court must promptly determine what property is and is not subject to forfeiture *after* the underlying criminal conviction. FED. R. CRIM. P. 32.2(b)(1). Relatedly, 21 U.S.C. § 853(k) precludes third parties from intervening "in a trial or appeal of a *criminal case* involving[] forfeiture" or "before the court issues a post-conviction order of forfeiture 21 U.S.C. § 853(k) (emphasis added). But nothing in this related rule and statute precludes claimants in *civil forfeiture* proceedings from seeking to dismiss such proceedings as expressly authorized by Supplemental Rule G. Indeed, this Court has not identified a *single* federal case that even remotely supports the Government's argument.

The Government cites *United States v. Holy Land Found. for Relief & Dev.*, 493 F.3d 469 (5th Cir. 2007). ECF No. 80 at PageID.468. But this nonbinding case is wholly inapposite. For starters, unlike here, *Holy Land* did not involve parallel civil and criminal forfeiture proceedings. 493 F.3d at 471–72. In fact, *Holy Land* did not involve, and does not discuss, civil forfeiture at all. In *Holy Land*, after a husband and wife were killed during a terrorist attack, their estate secured a judgment against Hamas that was enforceable against the Holy Land Foundation for Releif and Development ("HLF"). *Id.* Separately, "the United States filed a forty-two count indictment against HLF" in a different federal district court and pursued *criminal* forfeiture against HLF property. *Id.* at 472. The Government in the criminal case secured a restraining order that "indefinitely froze the assets of HLF and its financial agents." *Id.* "[S]uddenly unable to obtain the funds upon which they levied, and which they believed belonged to them," the husband-and-wife-estate *intervened in the criminal proceedings*, and attempted to appeal the criminal restraining order to the Fifth Circuit. *Id.* After rehearing en banc, the Fifth Circuit dismissed the estate's appeal, partly because

- 28 -

21 U.S.C. § 853(k) precluded the estate's third-party intervention in pending criminal forfeiture proceedings. *Id.* at 477 (noting the estate "may not intercede in the pending HLF prosecution at this time, at least not in the fashion in which they have done so").

Unlike the estate in *Holy Land*, the Semenchuks do not seek to intervene in the pending *criminal* proceedings against Andrew Semenchuk and the other Criminal Defendants, Case No. 23-20676. Instead, the Semenchuk claimants seek to dismiss the *civil* forfeiture complaint filed against their purported assets. Neither Criminal Rule 32, 21 U.S.C. § 853(k), nor *Holy Land* prevent them from doing so.

## B.  Standing

As in any federal case, to "contest a governmental forfeiture action," claimants "must have Article III standing." *United States v. Real Prop. Located at 4527-4535 Michigan Ave., Detroit, Mich.*, 489 F. App'x 855, 857 (6th Cir. 2012). And Rule G emphasizes that the claimant bears this burden. *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 498 (6th Cir. 1998); Supplemental Rule G(8)(b)(i) ("A claimant who *establishes standing* to contest forfeiture may move to dismiss the action under Rule 12(b)." (emphasis added)). Despite this clear prerequisite, neither the Semenchuks nor the Government discuss standing whatsoever. *See* ECF Nos. 79; 80; 81. This is even more surprising given that this Court granted the Semenchuks a 15-page extension to support their motion, ECF No. 78, and the Parties collectively filed nearly 160 pages of briefing. *See* ECF Nos. 79; 80; 81.

Yet, at the pleading stage, the burden to establish standing and contest a forfeiture complaint is relatively modest. The Sixth Circuit has declined "to adopt any type of hard-and-fast requirement for the initial evidentiary showing necessary for standing," *$515,060.42*, 152 F.3d at

498, and the claimant need only "colorable ownership, possessory[,] or security interest in at least a portion of the defendant property." *4535 Michigan Ave.*, 489 F. App'x at 857.

Here, although not discussed in their motion or briefs in support, the Semenchuks' verified claims sufficiently allege their respective ownership of and interest in their personal bank and trust accounts, seized subject to forfeiture as Defendants *in rem* 5 through 11. *See* ECF Nos. 47; 48; *see also United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342, 349 (6th Cir. 2017) ("A claimant with such an interest has Article III standing because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property." (internal quotations omitted)); *id.* at 351 ("At the pleading stage, a verified claim of ownership is sufficient to satisfy Article III[.]"). The Government does not dispute that these Defendants *in rem*, as explicitly identified in the Civil Forfeiture Complaint, are the Semenchuks' respective property. *See* ECF Nos. 80; *see also* ECF No. 71 at PageID.341–50.

### C. Failure to State a Claim

Onto the merits. The Semenchuks first argue the Civil Forfeiture Complaint should be dismissed because the Complaint fails to state a "viable money laundering forfeiture claim" and fails to "trace the Semenchuks' assets to wire fraud." ECF No. 79 at PageID.403–15. As explained below, both argument lacks merit.

#### 1. Legal Standard

Ordinarily, to survive a civil motion to dismiss for failure to state a claim under Civil Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Reviewing courts must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

But civil forfeiture complaints are subject to different standards. Although Rule G provides "heightened" pleading requirements for civil forfeiture complaints, *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 196 (D.D.C. 2014), the hurdle is still low, and the standard of review is still deferential. To survive a motion to dismiss for failure to state a claim, a forfeiture complaint need only contain "sufficiently detailed facts to support a *reasonable belief* that the government will be able to meet its burden of proof at trial." Supplemental Rule G(2)(f) (emphasis added). All factual allegations must be accepted as true, *United States v. $506,069.09 Seized From First Merit Bank*, 664 F. App'x 422, 433 (6th Cir. 2016), and "n[o] complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *see also* Supplemental Rule G(8)(3)(D).

Because the Government proceeds under *two* theories of forfeiture, *see supra* Section I.B, their burden at trial is twofold. To prove the Defendants *in rem* are subject to forfeiture as *proceeds* of the alleged fraudulent overbilling, the Government need only show, by a preponderance of the evidence, that these assets are traceable to the alleged overbilling. 18 U.S.C. § 983(c)(1). To prove the Defendants *in rem* were used to *launder* these proceeds, however, the Government must show a "substantial"—but not necessarily direct—connection between the Defendants *in rem* and money laundering. 18 U.S.C. § 983(c)(3); *see also $1,700,000.00*, F. Supp. 2d at 649 (E.D. Mich. 2008); *United States v. Approximately $9,105,221.62 in Funds*, No. 1:20-CV-23278, 2024 WL 3738926,

at *7 (S.D. Fla. July 26, 2024), *report and recommendation adopted*, No. 1:20-CV-23278, 2024 WL 5165872 (S.D. Fla. Dec. 19, 2024) (explaining this distinction between burdens); *United States v. Title & Int. in the Real Prop. & Appurtenances*, No. EP-14-CV-60-DB, 2015 WL 12748176, at *5 (W.D. Tex. Mar. 24, 2015) ("[W]hile the Government must ultimately prove a substantial connection . . . at trial . . . , at the pleadings stage the Government must only convince the Court that there is evidence sufficient to support a *reasonable belief* that the Government will be able to prove that substantial connection at trial." (emphasis in original)).

### 2.   Analysis

Accepting all factual allegations as true, the Amended Civil Forfeiture Complaint supports a reasonable belief that, at trial, the Government could (1) prove, by a preponderance of the evidence, that the Defendants *in rem* are traceable proceeds of the alleged fraudulent overbilling, and (2) show that a "substantial connection" between these Defendants *in rem* and money laundering. The viability of each theory will be discussed in turn.

### a.   Proceeds—18 U.S.C. § 983(a)(1)(C)

Federal statute authorizes the forfeiture of property "which constitutes or is derived from proceeds traceable to" "specified unlawful activity" including wire fraud and, separately, a "conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C) (incorporating 18 U.S.C. § 1343 through 18 U.S.C. 1956(c)(7)). Both forms of alleged unlawful activity will be addressed before turning to traceability.

### i. Wire Fraud

The elements of wire fraud are "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or

property." *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000). Each element will be discussed in turn.

     ***Scheme or Artifice to Defraud.*** The first element—a scheme or artifice to defraud—includes "any plan or course of action by which someone intends to deprive another by deception . . . of money or property by means of [materially] false . . . pretenses, representations, or promises." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). This standard is intentionally amorphous. *See id.* (noting this element is "not defined according to technical standards" and is instead a "reflection of moral uprightness, . . . fundamental honesty, [and] fair play"). The Amended Forfeiture Complaint sufficiently alleges a scheme or artifice to defraud. Specifically, the Complaint alleges the Criminal Defendants planned to deprive MDOT of federal funds by artificially increasing reimbursable expenses once MDOT awarded SSI a contract. And the Government alleges this artificial overbilling was accomplished through two types of materially false representations.

     First, the Amended Complaint alleges that the Criminal Defendants falsely represented to MDOT that 2SI, 3SI, and Southfield IT were independent from SSI such that, under applicable regulations, MDOT would reimburse SSI—and the Criminal Defendants—in full for all rental expenses attributable to these companies. ECF No. 71 at PageID.327–39. And, as alleged, these false representations were material. Had the Criminal Defendants disclosed their alleged common control of all four entities, SSI would only have been entitled to partial reimbursement for the "normal costs of ownership" for the various property it rented from 2SI, 3SI, and Southfield IT. *See id.* at PageID.333–34. Simply put, had the Defendants accurately represented the common ownership of each "SSI Group" entity, SSI would have received *millions* of dollars less in federally funded reimbursements from MDOT throughout the alleged decade-long scheme.

Second, the Amended Complaint alleges that the Criminal Defendants falsely represented to MDOT that their wives and romantic partners worked as "project assistants" on awarded transportation contracts. *Id.* at PageID.339–41. These alleged misrepresentations were material, too. Because SSI was entitled to full reimbursement of its "direct labor costs" on all awarded contracts, lying to MDOT about the number of employees who worked on contracts or the hours they worked directly inflated MDOT's reimbursement.

*Use of Wires.* The second element of wire fraud—the use of interstate wires—is similarly sufficiently alleged. The Amended Forfeiture Complaint alleges that, on all contracts throughout the decade-long conspiracy, MDOT paid and reimbursed SSI by electronically wiring funds from MDOT's bank account to SSI's primary Huntington Bank account. *Id.* at PageID.327; *accord United States v. Bartlett*, 731 F. Supp. 3d 836, 846 (E.D. Mich. 2024), *aff'd sub nom. United States v. Semenchuk*, No. 24-1405, 2024 WL 4751486 (6th Cir. Oct. 18, 2024) (noting the operative criminal indictment alleges "MDOT wired funds from its financial institution, Comerica Bank in Auburn Hills, Michigan, to SSI's account with Huntington National Bank in Columbus, Ohio").

*Intent to Deprive.* The third and final wire fraud element—that the Criminal Defendants intended to deprive MDOT of money—is similarly sufficiently alleged. The Civil Forfeiture Complaint expressly alleges the Criminal Defendants "intend[ed] to defraud" MDOT of federal funds. ECF No. 71 at PageID.326, 334. And the Government has provided sufficient factual detail to support this allegation, including that the Criminal Defendants misrepresented SSI's ownership shortly after they "entered into a secret agreement" in February 2011 that "each would own a 20[%] interest in SSI, 2SI, [and] 3SI" with the specific intent to inflate reimbursable expenses. Nothing more is required at this juncture. *See United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir. 1966)

("[T]he question of intent is generally considered to be one of fact to be resolved by the . . . jury" at trial.).

In sum, the Government sufficiently alleges all three elements of wire fraud. The Semenchuks do not argue to the contrary. *See* ECF Nos. 79; 81.

### ii. Conspiracy to Commit Wire Fraud

The proceeds of *conspiracies* to commit wire fraud can be forfeited, too. U.S.C. § 981(a)(1)(C) (authorizing the forfeiture of proceeds of wire fraud "or a conspiracy to commit such offense"). The elements of such conspiracies include (1) a "knowing[] and willfull[] agreement . . . to commit an act of wire fraud, and (2) "at least one overt act in furtherance of the agreement." *United States v. Cunningham*, 679 F.3d 355, 373 (6th Cir. 2012) (internal quotations omitted).

The Civil Forfeiture Complaint sufficiently alleges both elements. The Government specifically alleges all five Criminal Defendants made material misrepresentations to MDOT after entering a written "secret" agreement in 2011 to equally own all SSI Group entities, and that these misrepresentations were specifically intended to "trick MDOT and USDOT into awarding DBE status to SSI" and, ultimately, "trick[] MDOT into compensating SSI for overhead expenses SSI did not incur, or for which SSI was not entitled to receive compensation." ECF No. 71 at PageID.324, 326. Alleged overt acts in furtherance include: (1) the submission of annual "no change affidavits" which falsely represented that Defendant Andrew Semenchuk was SSI's majority owner to obtain DBE certification, *id.* at PageID.326–27; (2) the submission of invoices to MDOT, which represented that 2SI, 3SI, and Southfield IT were independent of SSI to inflate reimbursements, *id.* at PageID.329–39; (3) the false inclusion of Defendants' spouses in SSI's payroll to inflate reimbursable direct labor costs, *id.* at PageID.339–41; and (4) the Criminal

Defendants' efforts to "split the illegally obtained payments equally among themselves," *id.* at PageID.324.

### iii. Traceability

In addition to adequately alleging wire fraud and conspiracy to commit wire fraud, the Amended Forfeiture Complaint contains sufficient facts—accepted as true—to support a reasonable belief that, at trial, the Government could prove each Defendant *in rem* is traceable to the proceeds of these crimes. *See $506,069.09*, 664 F. App'x at 433 (citing Rule G(2)(f)). The Government specifically alleges that Defendants' overbilling scheme deprived MDOT of "over $12,600,000," all of which was transferred from MDOT to SSI's Primary Bank account at Huntington National Bank, account number XXXXXX3633. ECF No. 71 at PageID.327, 341. From there, the Government alleges these proceeds were distributed to all Defendants *in rem* either directly or indirectly, such that each Defendant *in rem* is either (1) "property traceable" to these proceeds, or (2) as explained in greater detail below, "involved in the laundering of" these proceeds. *Id.* at PageID.341. And the Government supports these claims by identifying specific transfers—both by date and amount—from SSI's primary bank account to each Defendant *in rem* bank account containing alleged overbilling proceeds. *See id.* at PageID.341–50. Nothing more is required to state a valid claim of forfeiture under 18 U.S.C. § 981(a)(1)(C).

The Semenchuks assert two arguments to the contrary. First, citing the Third Circuit's recent, nonbinding opinion in *United States v. Kousisis*, 97 F.4th 421 (Apr. 1, 2024), the Semenchuks argue that the Government "has failed to make a prima facie[13] case that *SSI* received"

---

[13] Why the Semenchuks recite a "prima facie" standard is entirely unclear. Despite using the phrase eight times throughout their motion, they cite no legal authority requiring prima facie proofs at the motion to dismiss stage. *See generally* ECF No. 79. More importantly, contrary to the Semenchuks' characterization, there is no "prima facie" proceeds standard. Before the Civil Asset Forfeiture Reform Act (CAFRA) was enacted in 2000, the Government was required to show "probable

fraudulent proceeds in the first instance because the Government has not alleged what the fair market value of SSI's services were, such that there is no "baseline against which to measure the amounts [MDOT] paid to SSI." *Id.* at PageID.407–10.

But *Kousisis* does not stand for such sweeping proposition and is altogether inapposite. In *Kousisis*, a jury convicted two individuals and their two corporations of wire fraud and conspiracy to commit wire fraud. *Kousisis*, 82 F.4th at 233. While, at first glance, the facts underlying the *Kousisis* conviction may seem somewhat analogous to those alleged here, a second glance reveals glaring and material differences. The Third Circuit neatly summarized the complex facts in that case as follows:

> On April 3, 2018, [Stamatios] Kousisis, Emanouel Frangos, and their respective companies, Alpha [Painting & Construction Co., Inc] and Liberty Maintenance, Inc. ("Liberty") were indicted for (1) conspiracy to commit wire fraud, in violation of § 1349, (2) wire fraud, in violation of § 1343, and (3) false statements, in violation of 18 U.S.C. § 1001.

> The indictment charged the Defendants with conspiring to defraud [US]DOT and [the Pennsylvania Department of Transportation (PennDOT")] by exploiting [US]DOT's DBE program. The charges arose out of two [US]DOT-financed contracts for work in Philadelphia: the Girard Point Project and the 30th Street Project (together, the "Philadelphia Projects" or the "Projects"). The Girard Point Project involved a $70.3 million contract to perform painting and repairs on the Girard Point Bridge over the Schuylkill River. It was awarded to Alpha, Liberty, and another entity . . . in 2009. The 30th Street Project involved a $50.8 million contract to perform repairs at the Amtrak 30th Street Train Station in Philadelphia. That contract was awarded to []other entit[ies] in 2010, [but] included a $15 million painting subcontract awarded to Alpha and Liberty in 2011.

> Both contracts for the Philadelphia Projects included DBE requirements. The Girard Point Project required the successful bidder to commit to contracting with a

---

cause" that the seized property was subject to forfeiture. *United States v. Real Prop. 10338 Marcy Rd. Nw., Canal Winchester, Ohio,* 659 F. App'x 212, 215 (6th Cir. 2016). And probable cause has been defined as something *less* than prima facie proofs yet more than mere suspicion. *See, e.g. United States v. $22,287,* 709 F.2d 442, 446–47 (6th Cir. 1983). But, as explained *supra* Section III.C.1, since CAFRA was enacted, a civil forfeiture complaint need only show sufficient facts to support a *reasonable belief* that, at trial, the Government could prove the property is subject to forfeiture by a preponderance of the evidence.

DBE for at least six percent of the contract amount. The 30th Street Project had a DBE requirement equal to seven percent of the contract amount. *The Defendants submitted bids in which they committed to working with Markias, Inc. on the Philadelphia Projects. Markias, Inc. was a company that had prequalified as a DBE in Pennsylvania.* The Defendants' bids stated that they would obtain $4.7 million in paint supplies from Markias for the Girard Point Project and $1.7 million for the 30th Street Project. The terms of the Philadelphia Projects' contracts provided that failure to comply with DBE regulations would be a material breach.

During the performance of these contracts, the Defendants periodically submitted false documentation regarding Markias' role in the Philadelphia Projects. That documentation was a condition precedent to obtaining credit towards the DBE goals and, therefore, to complying with the contracts' terms. Each of those submissions falsely certified that Markias acted as a "regular dealer" in supplying products. In reliance on these misrepresentations, PennDOT . . . paid the Defendants based on their asserted compliance with the Projects' DBE requirements. As established at trial, failure to certify compliance with the DBE requirements could have led to debarment, financial penalties, or withholding of progress payments.

Rather than supplying products or performing some other commercially useful function as required by the explicit terms of the contracts, Markias served merely as a pass-through for Alpha [and] Liberty. Markias did not do any work on the Projects or supply any of the materials for them, despite the Defendants' certifications to the contrary.

To hide the fact that Markias was doing no work on the Philadelphia Projects, the Defendants arranged for the true paint suppliers to send their invoices to Markias. Markias then issued its own invoices, added a 2.25% fee, and forwarded the pass-through invoices to Alpha [and] Liberty. Alpha [and] Liberty then forwarded those fraudulent invoices to PennDOT. This arrangement was detailed in a letter from Kousisis to Markias. The letter specified that Alpha [and] Liberty would identify the actual suppliers for the products that it needed. Alpha [and] Liberty would then negotiate prices and terms with those suppliers and create fraudulent purchase orders in Markias' name. In turn, the Defendants issued two sets of checks to Markias. One check paid Markias its 2.25% fee for acting as a pass-through. Markias forwarded the other check to the actual suppliers to pay for the materials that the Defendants ordered directly from them. The Defendants also routed invoices related to supplies used on projects outside Pennsylvania through Markias. This made it appear that the materials were used on the Philadelphia Projects.

*Id.* at 234–35 (emphasis added). So as alleged here, the relevant fraudulent conduct involved

federally funded transportation contracts and the DBE Program. But this is where the similarities

end. Factually, *Kousisis* did not address the precise fraud alleged here: overbilling through (1) false

representations concerning a contractor's relationship to other commonly controlled entities to inflate reimbursements for rental expenses, and (2) false representations concerning a contractor's "employees" to inflate direct labor costs. Legally, *Kousisis* did not address the propriety of civil forfeiture proceedings whatsoever and instead held that the district court erred at sentencing by incorrectly calculating the loss caused by the defendant's fraud. *Id.* at 244–50. Indeed, the Third Circuit held that the district court erroneously calculated loss because, since the relevant contracts required work by "both DBE and non-DBE entities" such that the non-DBE defendants "always stood to lawfully profit," the true measure of loss was *not* the full value of defendants' profits but rather "the fair market value" of the services they provided.[14] *Id.* at 247–50.

Even if the true value of loss at Defendants' *criminal sentencing* is the money, SSI received offset by the fair market value of the services SSI provided to MDOT—a conclusion this Court need not address at this pretrial stage yet doubts given the factual dissimilarity between the fraud and contracts here and in *Kousisis*—such "fair market value" need not be alleged in the *civil forfeiture complaint* to state a valid claim. *$506,069.09*, 664 F. App'x at 434 ("The Government is not required to allege in the complaint all of the facts and evidence at its disposal. It is sufficient for the Government to simply plead enough facts for the claimant to understand the theory of

---

[14] In June 2024, the Supreme Court granted certiorari to address another aspect of the Third Circuit's holding and resolve a circuit split concerning the "fraudulent inducement" theory of wire fraud—whether a defendant "deprives" a victim of "property" for the purposes of wire fraud by merely inducing the victim to provide the property to *that specific defendant*, when the victim would have otherwise provided the property to another party. *See Kousisis v. United States*, 144 S. Ct. 2655 (2024). The Third Circuit thought so. *United States v. Kousisis*, 82 F.4th 230, 240 (3d Cir. 2023) ("Appellants set out to obtain millions of dollars that *they* would not have received but for their fraudulent misrepresentations. Depriving PennDOT of DBE performance was incidental to that scheme." (emphasis added)). The Sixth Circuit has held otherwise. *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) ("Paying the going rate for a product does not square with the conventional understanding of 'deprive'"); *see also United States v. Bolos*, 104 F.4th 562, 569–73 (6th Cir. 2024).

forfeiture [and] undertake an adequate investigation."). Here, the Government has alleged the precise amount of overbilling wire fraud proceeds: $12,600,000. ECF No. 71 at PageID.341. And the Government has alleged all ill-gotten gains were directly deposited in SSI's Primary Bank Account. *Id.* Thus, the Semenchuks' argument that the Amended Forfeiture Complaint insufficiently shows *SSI's* receipt of wire fraud proceeds lacks merit.

The Semenchuks then argue, alternatively, that the Government insufficiently alleged such proceeds are traceable to their specific assets. ECF No. 79 at PageID.402–05. Not so. The Amended Forfeiture Complaint expressly alleges that each of the seven Defendants *in rem* the Semenchuks have claimed constitute or were funded by the wire fraud proceeds first deposited in SSI's Primary Bank Account. *See* ECF No. 71 at PageID.343–46. Rather than challenging the sufficiency of the Amended Forfeiture Complaint, the Semenchuks turn to *Honeycutt v. United States*, 581 U.S. 443 (2017) and seemingly argue that the pretrial restraints on their purported property are improper because the Government has not yet *shown* or *proven* that such property is "tainted" by criminal conduct at a "hearing." ECF No. 79 at PageID.402. But *Honeycutt* examined *criminal* forfeiture under 21 U.S.C. § 853, not *civil* forfeiture under 18 U.S.C. § 981(a)(1)(C). *See* 581 U.S. at 445. They are not the same. Recognizing the differences in these statutes and the proceedings they require, the Sixth Circuit has squarely held that "the reasoning of *Honeycutt* is not applicable to § 981(a)(1)(C)." *United States v. Sexton*, 894 F.3d 787, 799 (6th Cir. 2018).

In sum, the Amended Complaint states a valid claim for civil forfeiture under 18 U.S.C. § 981(a)(1)(C) because it contains sufficient facts to support a reasonable belief that, at trial, the Government will be able to prove, by the preponderance of the evidence, that the Defendants *in rem* constitute or are traceable to proceeds of the Criminal Defendants' wire fraud and conspiracy to commit the same.

### b.  Money Laundering—18 U.S.C. § 981(a)(1)(A).

But the Government advances another forfeiture theory—and the Semenchuks contest it. The Government also alleges that the Defendants *in rem* are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because such property was "involved in" money laundering or attempted money laundering, in violation of "18 U.S.C. §§ 1956 and/or 1957." ECF No. 71 at PageID.322.

18 U.S.C. § 1956 provides:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
> (B) knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

On the other hand, 18 U.S.C. § 1957 prohibits individuals from "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction" involving at least $10,000 in "criminally derived property."

As explained, the Government's burden of proof at trial for this forfeiture theory is different than its burden to prove proceeds under § 981(a)(1)(C). *See supra* Section III.C.1. To succeed on this forfeiture theory at trial, the Government must prove a "substantial connection" between the specific Defendant *in rem* and one of these types of money laundering. *See* 18 U.S.C. § 983(c)(3); *$506,069.09*, 664 F. App'x at 432. A "[s]ubstantial connection may be established by showing that use of the property made the prohibited conduct less difficult or more or less free from obstruction

or hindrance." *United States v. Approximately $299,873.70 Seized from a Bank of Am. Acct.*, 15

F.4th 1332, 1340 (11th Cir. 2021) (quoting *United States v. Herder*, 594 F.3d 352, 364 (4th Cir.

2010)). But, as explained, to survive the Semenchuks' motion to dismiss, the "Government must

only convince the Court that there is evidence sufficient to support a *reasonable belief* that the

Government will be able to prove that substantial connection at trial." *Title & Int. in the Real Prop.*

*& Appurtenances*, 2015 WL 12748176, at *5 (emphasis in original).

The Amended Complaint contains sufficient factual allegations to support a reasonable

belief that this "substantial connection" may be made at trial. As to the Semenchuks' assets, the

Complaint alleges their bank accounts received millions from the SSI Primary Bank Account

throughout the alleged conspiracy. Specifically, the Government alleges:

1.  The Semenchuks' joint Michigan State Federal Credit Union (MSFCU)
    Account No. XXXX47-80 ($20,573.60 of which was seized as Defendant *in
    rem* 5 as fraud proceeds) received "approximately $1,735,000" from SSI's
    Primary Bank Account from October 2017 through April 2019, including a
    single $1,351,654 deposit on December 19, 2018.

2.  The Semenchuks' joint MSFCU Account No. XXXX47-20 ($61,494.41 of
    which was seized as Defendant *in rem* 6 as fraud proceeds) received $517,000
    from SSI's Primary Bank Account from  October 2017 through April 2019.

3.  Tara Semenchuk's Revocable Living Trust with MSFCU, Account No.
    XXXX25-26, ($14,903.25 of which was seized as Defendant *in rem* 7 as fraud
    proceeds) received over $415,000 from the Semenchuks' two MSFCU accounts
    listed above, both of which were "funded by the SSI Primary Bank Account."

4.   Tara Semenchuk's Revokable Living Trust with MSFCU, Account No.
    XXXX25-86 ($4,698.05 of which was seized as Defendant *in rem* 8 as fraud
    proceeds) received over $700,000 in funding by SSI's Primary Bank Account,
    after first being funneled through Tara's other revocable trust with MSFCU.

5.  The Semenchuks' five-year certificate of deposit with MSFCU Account No.
    XXXX25-C0 (all of which was seized as Defendant *in rem* 9 as fraud proceeds)
    was funded by Tara's revocable trust (XXXX25-26) which was first funded by
    SSI's Primary Bank Account.

6.  Tara Semenchuk's trust with TD Ameritrade Account No. XXX-XX2918, now Charles Schwab Account No. XXXX-0476 (all of which was seized as Defendant *in rem* 10 as fraud proceeds) was funded by SSI's Primary Bank Account after being funneled through other accounts. "This includes, but is not limited to, two checks drawn on MSUFCU Account No. XXXX25-86 in respective sums of $100,000 and $500,000 and deposited to Scottrade account 72437354, (identified as TD Ameritrade Account Number XXXXX2918 at the time of seizure and now Charles Schwab Account No. XXXX0476). The $100,000 and $500,000 deposited were respectively made on or about December 8, 2017, and January 18, 2018."

7.  The Semenchuks' joint Vanguard Account No. XXXX9050 (all of which was seized as Defendant *in rem* 11 as fraud proceeds) was funded by SSI's Primary Bank Account after being funneled through other accounts. "This includes, but is not limited to, from November 8, 2018 through May 21, 2019, four ACH transfers from MSUFCU Account No. XXXX47-80, totaling $1,775,000. As explained . . . , MSUFCU Account No. XXXX47-80 received significant deposits from the SSI Primary Bank Account."

ECF No. 71 at PageID.343–46.

Aside from these assets, the Government alleges the Criminal Defendants—including Andrew Semenchuk—expressly created Southfield IT, one of the three companies through which Criminal Defendants allegedly accomplished their overbilling scheme, to have a new bank account that could be used to "easily move the illegally obtained MDOT funds back to themselves and their partner[s and] spouses." *Id.* at PageID.330. And the Government supported this laundering claim by alleging: (1) "[t]he Southfield IT bank account received 99.2% of its funding from SSI and .7% from SSI's executives. Over 95% of the money SSI paid to Southfield IT was subsequently transferred into the personal bank accounts of Adam Ball, Sarah Ball, . . . and Tara Semenchuk[,]" *id.*; *see also id.* at PageID.332; and (2) the other alleged "SSI Group" companies—2SI and 3SI— "did not conduct significant financial transactions with any clients other than SSI" and "were funded nearly exclusively by SSI, its executives, or their partner[s and] spouses." *Id.* at PageID.333. Collectively, and construed in a light most favorable to the Government, these fact

support a reasonable belief that, at trial, the Government could prove a substantial connection between the Semenchuks' assets and money laundering.

The Semenchuks assert several arguments to the contrary. All lack merit. First, the Semenchuks point out that the *criminal indictment* does not charge any defendant with money laundering so this offense is nothing but an unsupported "phantom limb." ECF No. 79 at PageID.410–11. This argument conflates civil and criminal forfeiture. "It is not necessary" for the Semenchuks "to be charged with a crime in order to subject" their assets to *civil forfeiture* under § 981(a)(1)(A). *See United States v. $506,069.09 Seized from First Merit Bank*, 72 F. Supp. 3d 818, 824 (N.D. Ohio 2014), *aff'd*, 664 F. App'x 422 (6th Cir. 2016).

The Semenchuks then argue that the Amended Forfeiture Complaint does not allege that they knew, or otherwise had the requisite intent to commit any type of money laundering prohibited in § 1956 or § 1957. ECF No. 79 at PageID.411–12 (noting the complaint "fails to allege even one of the multiple requirements for any of these money laundering violations"). This, too, conflates civil and criminal proceedings. True, if the Semenchuks were criminally charged with money laundering in violation of either § 1956 or § 1957, the Government would need to allege—and prove—that they had the requisite *mens rea*. But, again, this is not a criminal case. Civil forfeiture under 18 U.S.C. § 981(a)(1)(A) "requires the 'involve[ment]' only of the '*property*' in a criminal act." *United States v. Approximately $299,873.70 Seized From a Bank of Am. Acct.*, 15 F.4th 1332, 1341 (11th Cir. 2021). "In other words, 'the [G]overnment ordinarily need not prove'"—let alone allege—"'a claimant's culpability for unlawful conduct to' forfeit their property in civil proceedings. *Id.* (quoting *United States v. Funds in the Amount of $100,120.00*, 901 F.3d 758, 768 (7th Cir. 2018)) (cleaned up). Contrary to the Semenchuks argument, applicable federal statutes place the burden on the *Semenchuks* to establish their *innocence*, rather than on the *Government*

to establish their *culpability*. *Id.* (citing 18 U.S.C. § 983(d)). Indeed, both Andrew and Tara have already asserted affirmative defenses of "innocent ownership" and accordingly contend they did not know about the underlying money laundering and other alleged criminal conduct. ECF Nos. 47; 48; *see also* 18 U.S.C. § 983(d)(2)(A)(i). But this is an issue for the trier of fact and has nothing to do with the propriety of the Government's pleadings. *See $299,873.70*, 15 F.4th at 1341 ("The owner's innocence generally—and his intent specifically—are part of a claimant's affirmative defense, with the claimant bearing the burden of proof. [18 U.S.C. § 983(d)] would serve no purpose if, as [the claimant] suggests, the burden of proving the fault of the owner fell on the government in the first instance.")

Finally, the Semenchuks argue, based on their own "sworn" declaration that they "possessed $1.5 million in 2015, well before the earliest alleged illegal transaction involving their accounts," "there is no connection" between their assets and money laundering, "let alone a substantial [one]." ECF No. 79 at PageID.413 (emphasis omitted). This argument puts the cart before the horse. As explained, the issue here is not whether a substantial connection exists but whether the Forfeiture Complaint contains enough factual allegations to support a *reasonable belief* such connection can be shown at trial. The Semenchuks' sworn declarations cannot be considered here, where the Court's review is limited to the four corners of the operative Complaint. *See Berry v. United States Dep't of Lab.*, 832 F.3d 627, 637 (6th Cir. 2016) (noting courts can only "look outside the four concerns of the complaint" when reviewing motions to dismiss if the materials "are referred to in the complaint and central to the claim[s]").

At bottom, the Government has alleged enough facts to support a reasonable belief that, at trial, it can show a substantial connection between the Semenchuks' assets and money laundering

in violation of either 18 U.S.C. §§ 1956 and 1957. Thus, the Government has stated a valid claim for forfeiture under 18 U.S.C. § 981(a)(1)(A).

### D. Due Process and Delay

Onward still. In addition to their arguments that the Amended Complaint fails to state valid forfeiture claims, the Semenchuks also seek dismissal due to delay and argue these prolonged proceedings have violated their constitutional due process rights.

#### 1. Legal Standard

In *United States v. $8,850*, 461 U.S. 555 (1983), the Supreme Court held that, in some circumstances, the Government's failure to file a forfeiture suit within a reasonable time after seizure violates a claimant's due process right to be heard "at a meaningful time." Indeed, the Court analogized civil forfeiture proceedings to a criminal defendant's right to a speedy trial and accordingly held that, to assess whether the delay is unconstitutional, courts should consider the four well-established "*Barker*" factors: (1) the length of the delay, (2) the reason for the delay, (3) the claimant's assertion of their right to a judicial determination of their ownership interest, and (4) the prejudice to the claimant. *Id.* at 564–65 (citing *Barker v. Wingo*, 407 U.S. 514 (1972)); *see also United States v. $75,900*, 835 F.2d 880 (6th Cir. 1987). No single factor is dispositive. *$8,850*, 461 U.S. at 565. All four factors should be balanced. *Id.*

The Government argues that, as a threshold matter, since *$8,850* analyzed only the constitutionality of delay between *seizure* and the *filing* of a civil forfeiture complaint, the Semenchuks improperly attempt to move the goalposts by arguing the delay between *seizure* and *trial* is unconstitutional, here. ECF No. 80 at PageID.457. The Government correctly notes that the Sixth Circuit has "consistently applied the" *Barker* balancing test "to the <u>initiation</u> of forfeiture actions, not the pace of a case once filed." *Id.* (emphasis in original) (citing *United States v.*

*$75,900*, 835 F.2d 880 (6th Cir. 1987); *United States v. Real Prop. 35555 Little Mack*, 211 F.3d 1271 (6th Cir. 2000); *United States v. Ninety Three Firearms*, 330 F.3d 414, 426 (6th Cir. 2003); *United States v. Salti*, 579 F.3d 656, 672 (6th Cir. 2009). But the claimants in those cases did not argue prejudicial *pretrial* delay—and instead argued, consistent with *$8,850*, that *prefiling* delay violated their due process rights. So the Sixth Circuit has had no occasion to consider whether *$8,850*'s reasoning applies to *pretrial*—in addition to *prefiling*—delay. One court within the Sixth Circuit has held that *$8,850* has a "broader reach" than prefiling delay, and accordingly applied the *Barker* factors to assess whether a requested stay in civil forfeiture proceedings violated claimants' due process rights. *United States v. Real Prop. Known as 223 Spring Water Lane, Knoxville, Knox Cnty.*, No. 6:18-CV-315-REW, 2020 WL 13551745 (E.D. Ky. Apr. 6, 2020). Federal courts outside the Sixth Circuit have similarly extended *$8,850*'s analysis and applied the four *Barker* factors to assess the constitutionality or pretrial delay in civil forfeiture proceedings. *See, e.g.*, *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1163 (2d Cir. 1986) (noting the "*Barker* test . . . applies to the holding of the forfeiture trial as well as to the filing of the action"); *United States v. $307,970.00*, 156 F. Supp. 3d 708, 716 (E.D.N.C. 2016) ("Although *$8,850.00* addresses only the 'narrow' issue of delay between seizure and filing, the 'flexible' due process principles articulated by the Court easily are expanded to cover situations in which the government unfairly delays a case from coming to trial."); *United States v. $20,000*, 589 F. Supp. 3d 240, 260 (D.P.R. 2022) (considering pretrial delay). And *$8,850* itself hinted as much, noting the flexibility of due process "necessarily compels courts to approach speedy trial cases on an *ad hoc basis*." 461 U.S. at 564 (internal quotations omitted). Ultimately, this Court need not decide this issue because, as explained below, even applying the *Barker* factors to the much longer *pretrial*—as opposed to *prefiling*—delay, the Semenchuks' due process rights have not been violated.

### 2.   Analysis

Each of the four *Barker* factors will be considered in turn.

#### a.   Length of Delay

The first factor is the length of the delay. *$8,850*, 461 U.S. at 565. To some extent, this factor is a "triggering mechanism," because, "until there is some delay which is *presumptively prejudicial*, there is no" need to analyze the three other factors. *United States v. Coffman*, 612 F. App'x 278, 290 (6th Cir. 2015) (quoting *Barker*, 407 U.S. at 530). Here, the Government seized the Semenchuks assets—like all other Defendants *in rem*—in July 2019. ECF No. 71 at PageID.318. Over five years later, trial has yet to occur. This five-year delay—which grows larger by the day—undoubtedly weighs in favor of a due process violation and triggers analysis of the remaining *Barker* factors. *See United States v. Ninety Three Firearms*, 330 F.3d 414, 425 (6th Cir. 2003) (finding five-year prefiling delay "both substantial and presumptively prejudicial"); *$8,850*, 461 U.S. at 565 (finding 18-month prefiling delay was "undoubtedly a significant burden").

#### b.   Reason for Delay

But the remaining *Barker* factors sink the Semenchuks' due process claim. Turning to the second factor, there is good reason for the lengthy, five-year delay since seizure. Indeed, there are two good reasons.

First, the year of delay between seizure and the filing of the initial forfeiture complaint was attributable to administrative forfeiture proceedings. Although the Parties provide little detail, the FBI initiated administrative forfeiture proceedings shortly after the Defendants *in rem* were seized on July 25, 2019. *See* ECF No. 80 at PageID.452. The Semenchuks filed verified claims for their four assets subject to administrative forfeiture as early as September 30, 2019. *See* ECF No. 80-1. In light of these pending administrative proceedings, the Semenchuks *twice* stipulated to adjourn

the Government's deadline to file a judicial forfeiture complaint under 18 U.S.C. § 983(a)(2) until July 28, 2020. ECF No. 80-2; *see supra* Section II (discussing applicable administrative forfeiture procedure). And, notably, the Semenchuks expressly agreed to "knowingly, intelligently, and voluntarily waive all constitutional and statutory challenges, and give up any rights they may have to seek dismissal" of a civil forfeiture complaint "on the grounds that it was not filed or returned on or before" this date. *Id.* at PageID.486.

Both the Supreme Court and the Sixth Circuit recognize that pending administrative forfeiture proceedings provide an "important justification" for delaying judicial forfeiture proceedings. *$8,850*, 461 U.S. at 566 ("[A]llowing the Government to wait for action on administrative [forfeiture] petitions eliminates unnecessary and burdensome court proceedings," and "a system whereby the judicial proceeding occurs after administrative action spares litigants and the government from the burden of simultaneously participating in two forums."); *Ninety Three Firearms*, 330 F.3d at 425 (finding pending administrative forfeiture proceedings provided "ample justification" for prefiling delay).

Second, the delay since the July 2020 initial forfeiture complaint was filed is largely attributable to the criminal investigation and pending proceedings. This Court sealed the initial forfeiture complaint the day after it was filed expressly to protect the Government's ongoing criminal investigation. *See* ECF Nos. 2; 3; *see also* Rule G(3)(c), Advisory Committee Note (2006) ("The seal . . . may be ordered for . . . protection of an ongoing criminal investigation, that would be defeated by prompt service[.]")

Ongoing criminal proceedings provide a compelling justification for even substantial delays in parallel civil forfeiture proceedings. *See $8,850*, 461 U.S. at 567 ("Pending criminal proceedings present similar justifications for delaying . . . civil forfeiture proceedings. A[]

contemporaneous civil proceeding could substantially hamper the criminal proceeding which . . . may often include forfeiture as part of [a] sentence. A prior civil suit may . . .estop later criminal proceedings and may provide improper opportunities for the claimant to discover details of a contemplated or pending criminal prosecution."); *Ninety Three Firearms*, 330 F.3d at 425 (6th Cir. 2003) (finding three-year prefiling delay was justified because "the government properly awaited" the *result* in parallel criminal proceedings); *United States v. $47,980 in Canadian Currency*, 804 F.2d 1085, 1089 (9th Cir. 1986) ("A criminal conviction may result in forfeiture, rending civil proceedings unnecessary.") This Court is mindful that pending criminal proceedings do not "automatically toll" civil forfeiture proceedings and are thus not dispositive in the due process analysis. *$8,850*, 461 U.S. at 567. Indeed, as the Supreme Court warned in *Barker*, eventually, the Government must bear the burden of delay, even where that delay is unavoidable or well-intentioned. 407 U.S. at 531; *see also $307,970.00*, 156 F. Supp. 3d at 718 ("The court cannot, and does not attempt to accurately predict the tipping point. Context is key.").

So what has taken so long on the criminal side? For starters, the case is quite complex, asserting 15 counts based on over 10 years of forensic financial accounting involving five defendants and at least four different companies. This takes time to explain, *see supra* Section I.A., let alone thoroughly investigate, synthesize, and present to a Grand Jury. *See $307,970.00*, 156 F. Supp. 3d at 718 ("[W]ell-founded criminal cases, and especially cases involving . . . conspiracies, do not materialize overnight."). On this point, the Semenchuks respond that, instead of investigating and building a case, the Government spent the four years following the filing of the civil forfeiture complaint "pressur[ing]" the Criminal Defendants to plead guilty. ECF No. 79 at PageID.396–98 (alleging the Government was "not investigating" and "was not litigating anything"). This argument is misplaced. Contrary to the Semenchuks' claim that the Government's

plea negotiations are illegitimate reasons to delay proceedings, *Id.* at PageID.394, "good faith efforts on the part of the Government to procure a" pretrial resolution "are plainly an acceptable reason for delay." *United States v. Real Prop. 35555 Little Mack*, 211 F.3d 1271 (6th Cir. 2000). Moreover, the Semenchuks' rhetoric that the Government has delayed proceedings by engaging in a "years-long pressure" campaign to coerce guilty pleas is disingenuous. Much of the delay the Semenchuks complain of is attributable to the Criminal Defendants' conduct, not the Government's.

From the onset of the criminal case and "at [the Criminal] Defendants' request, the Government postponed its presentation to the grand jury to allow Defendants time to hire additional counsel and make a presentation to the United States Attorney for the Eastern District of Michigan, urging that the prosecution be declined. And, when the United States Attorney rejected Defendant's request, the Government granted Defendants additional time to appeal the decision to the Deputy Attorney General in Washington, D.C., who also rejected Defendants' request to not prosecute the matter." *Bartlett*, 731 F. Supp. 3d at 847 (internal citations and quotations omitted). Since then, the Criminal Defendants—including Andrew Semenchuk—filed several substantive pretrial motions to strike, suppress, and dismiss, not to mention motions seeking a bill of particulars and additional discovery. *See generally United States v. Bartlett*, 1:23-CR-20676. Indeed, two motions—both of which were joined by Andrew Semenchuk—explicitly sought to *delay* proceedings and adjourn the trial date because rotating Defense Counsel needed additional time to review discovery and prepare. *Id.*, ECF Nos. 110; 162. Causing further delay, Andrew Semenchuk and other Criminal Defendants filed an interlocutory appeal of this Court's decision denying one of these motions, which the Sixth Circuit granted. *Id.*, ECF Nos. 76; 79; 80.

This is not to say the Defendants *improperly* filed these pretrial motions or sought interlocutory appeal. But these decisions prompted significant delay.

At bottom, although five years have passed since the Government first filed its initial civil forfeiture complaint, this delay is wholly justified by the FBI's administrative forfeiture proceedings and the complex companion criminal case. *See $8,850*, 461 U.S. at 568 ("In sum, the Government's diligent pursuit of pending administrative and criminal proceedings indicate strongly that the reasons for its delay in . . . civil forfeiture proceeding[s] were substantial."). Thus, the second *Barker* factor strongly supports denying the Semenchuks' due process claim.

### c. Assertion of Rights

The third *Barker* factor similarly suggests no due process violation. This factor assesses whether the claimant has asserted their right to a judicial determination of their ownership interest. *Id.* at 568–69. Indeed, claimants can "rapid[ly] trigger" such determination "if [they] desire it, so their failure to pursue available remedies "can be taken as some indication" that they "did not desire" such determination. *Id.* at 569.

The Semenchuks could have filed a petition for remission of their property throughout the FBI's administrative forfeiture proceedings, or sought to have these proceedings removed to this Court. *See Ninety Three Firearms*, 330 F.3d 414, 425 (6th Cir. 2003). They did not. The Semenchuks could have sought the return of their property at any point during the *year* between seizure and the filing of the civil forfeiture complaint under Criminal Rule 41. *Id.*; *see also supra* Section II (explaining this rule provides no recourse once civil forfeiture proceedings are filed). They did not. Although these forfeiture proceedings were sealed for years, the Semenchuks were notified of the proceedings as early as August 4, 2020, ECF No. 80-3 at PageID.495, and accordingly could have sought to unseal portions of the docket or otherwise petition the

Government for the return of their property which, if denied or stalled, would have prompted judicial review. *See* 18 U.S.C. §983(f); Supplemental Rule G(8)(d); *supra* Section II. They did neither.

The Semenchuks' "inaction weighs heavily against [them] when considering whether a due process violation occurred." *United States v. Scarfo*, 41 F.4th 136, *see also $12,698.38*, 2024 WL 2805285, at *12 (denying claimant's due process argument because, even though the civil forfeiture complaint was under seal for years, there was "no evidence in the record" to suggest the claimants sought the return of their property under Criminal Rule 41 or otherwise took action to recover their property or, at least, obtain a judicial determination of ownership);

### d. Prejudice

The final factor is "whether the claimant has been prejudiced by the delay." *$8,850*, 461 U.S. at 569. The Semenchuks argue the delay has prejudiced them because they have been unable to access the funds seized from their accounts for years. ECF No. 79 at PageID.400–02. But this is not the type of "prejudice," courts consider in a due process inquiry.  *See $170,000*, 2024 WL 2922718, at *7, n. 10 (D.P.R. June 10, 2024). Instead, a claimant is prejudiced by a delay in proceedings if they are "hampered . . . in presenting a defense on the merits, though, for example, the loss of witnesses or other important evidence." *$8,850*, 461 U.S. at 569. The Semenchuks do not advance this argument whatsoever, ECF Nos. 79 at PageID.400–02; 81, so this final factor also weighs against a finding that the Semenchuks' due process rights were violated. *See Ninety Three Firearms*, 330 F.3d at 426 (rejecting claimant's due process argument because he "failed to provide th[e] court with any evidence of how the delay . . . prejudiced his defense"); *Coffman*, 612 F. App'x at 290 (same).

In sum, the Semenchuks are correct that these proceedings have been pending for years. But delay in itself does not violate due process. Here, the delay has been justified by pending administrative forfeiture and complex criminal proceedings—which Andrew Semenchuk and the other Criminal Defendants have themselves sought to delay. And despite the delay, the Semenchuks have not availed themselves of the appropriate opportunities for judicial intervention and have not shown prejudice. Thus, balancing all four *Barker* factors, their due process claim fails.

### E.   Affidavit of Interest Concerning the Semenchuks' Residence

Onward, one last time. In addition to their arguments that the operative complaint fails to state valid forfeiture claims, *see supra* Section III.C, and their argument that the delay in these proceedings has violated their due process rights, *see supra* Section III.D, the Semenchuks separately seek to "lift" a "restraint" on their home they contend is improper and unlawful. ECF No. 79 at PageID.415–18.

A bit of background is necessary. Michigan law provides that "any person having knowledge" of "condition[s] or events that may terminate an estate or interest in real property" may file an affidavit stating such knowledge "in the office of the register of deeds of the county where the real property is located." MICH. COMP. LAWS § 565.451(b). In accordance with this state statute, the Government recorded an affidavit of interest in the  Register of Deeds Office in Jackson County, Michigan, on July 26, 2019—the day after the FBI seized all Defendants *in rem*. *See* ECF No. 79-6 at PageID.443–45.  In this affidavit, the Government notified the County that it was aware of "certain fact(s), condition(s), and event(s)"—namely potential wire fraud and money laundering—which "may terminate an estate or interest" in the Semenchuks' residential property in Rives Junction, Michigan. ECF No. 79-6 at PageID.443 (citing 18 U.S.C. §§ 1343, 1956).

The Semenchuks contend the Government's affidavit is a "significant restraint" on their property because it functionally operates as a "*lis pendens*" and prevents them from selling or mortgaging their property. ECF No. 79 at PageID.415–16. And the Semenchuks argue this restraint is improper because the affidavit fails to explain how their property is connected to suspected wire fraud and money laundering. *Id.* So the Semenchuks seek injunctive relief and ask this Court to "lift" the restraint on their home. *Id.* at PageID.417.

As a threshold issue, contrary to the Semenchuks' characterization, it appears the Government's "affidavit of interest'" is *not* a *lis pendens* and does not restrain their Rives Junction property in any way. A *lis pendens*—Latin for "suit pending"—is a notice "'recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation and that any interests acquired during the pendency of the suit are subject to its outcome.'" *United States v. Parrett*, 530 F. 3d 422, 424, n.1 (6th Cir. 2008) (quoting Black's Law Dictionary 942 (8th ed. 2004)); *accord United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 58 (1993) ("Sale of the property can be prevented by filing a notice of *lis pendens* as authorized by state law *when the forfeiture proceedings commence*." (emphasis added)). But, here, the Government's affidavit of interest says nothing of pending litigation. *See* ECF No. 79-6. Indeed, the affidavit was recorded over a year *before* the civil forfeiture proceedings began and over four years before the criminal proceedings began. *Id.* Moreover, the affidavit does not discuss any restrictions on the Semenchuks' ability to sell or mortgage their property, nor does it discuss any other restraints. Notably, Michigan law codified the filing of *lis pendens* in MICH. COMP. LAWS § 600.2701—an entirely separate statute from the one authorizing the Government's affidavit of interest, MICH. COMP. LAWS § 565.451(b).

- 55 -

The Semenchuks cite a twenty-year-old, unpublished Michigan Court of Appeals decision for the proposition that affidavits of interests are nevertheless the "equivalent of a *lis pendens*." ECF No. 79 at PageID.416 (citing *In re Contempt of Mitan*, 2002 WL 31082190, at *3 (Mich. Ct. App. Sept. 17, 2002)). But that case concerned specific affidavits of interest recorded by a company after the company was enjoined from recording *lis pendens* against particular property, and these specific "affidavits of interest," unlike the one the Government recorded here, "cloud[ed]" the owner's title to the property and impeded the owner from "consummating [a] pending transaction." *Id.* at *2–3. Aside from *Mitan*, which is readily distinguishable, the Semenchuks do not cite—and this Court has not been able to identify—a single authority equating affidavits of interests recorded under § 565.451a and *lis pendens*. Most case law on the subject suggests the opposite. *See, e.g.*, *In re Bright*, No. 11-46894-MBM, 2013 WL 3270346, at *6 (Bankr. E.D. Mich. June 26, 2013) (mortgagee filed an affidavit of interest under § 565.451a after discovering he recorded the mortgage in the wrong county's register of deeds, sued the mortgagor to execute a new mortgage, and then filed a *lis pendens* for the lawsuit in the correct county's register of deeds); *Michigan Prop. Ventures, LLC v. United States*, No. 14-10215, 2014 WL 2895485, at *7 (E.D. Mich. June 26, 2014) (noting affidavits of interest filed under § 565.451a parallel to forfeiture proceedings "do not contain any language suggesting that the Properties are encumbered" and dismissing complaint seeking to void affidavits for lack of subject matter jurisdiction).

And even if the Government's affidavit of interest was the functional equivalent of a *lis pendens* and somehow restrained the Semenchuks' property, this Court will not "lift" such restraint here. Critically, the Semenchuks' Rives Junction property is *not* a Defendant in this civil forfeiture case. It is, instead, subject to forfeiture as alleged in the operative *criminal* indictment. *See* Second

- 56 -

Superseding Indictment at PageID.1529. To the extent the Semenchuks challenge the propriety of a pretrial "restraint" on property subject to criminal forfeiture, such challenge must be presented in the criminal proceedings.[15] It has no home here. *See United States v. $299,218.48*, No. 22-CV-3304-ZMF, 2024 WL 3433726, at *3 (D.D.C. July 16, 2024) (noting 28 U.S.C. § 1335(b) confers in rem jurisdiction only "over the defendant property"); *see also Roberts v. United States*, 141 F.3d 1468, 1471 (11th Cir. 1998) (dismissing plaintiff's civil complaint that sought to void a notice of *lis pendens*, noting this remedy "is properly sought only in the court in which the criminal forfeiture case is pending"); *United States v. Jarvis*, 499 F.3d 1196, 1198 (10th Cir. 2007) (defendant in criminal case filed a motion to lift *lis pendens* for property allegedly subject to criminal forfeiture); *United States v. Rivera,* No. 22-20552-CR, 2023 WL 4363544, at *1 (S.D. Fla. July 6, 2023) (same). The Semenchuks' final request for relief will accordingly be denied.

---

[15] Notably, even if properly presented, the Semenchuks' argument faces an uphill battle. Separate from the Semenchuks' failure to show that the Affidavit of Interest is a *lis pendens* or otherwise restrains their property in any way, both the Supreme Court and the Sixth Circuit recognize that, ordinarily, *lis pendens* do not violate due process nor constitute an improper seizure. *See Anderson v. Akron*, 116 F.3d 804, 811–12 (6th Cir. 1997) (noting "[t]he mere filing of an ordinary lien or *lis pendens* . . . simply does not . . . necessitate[] prior notice and an opportunity to be heard" and concluding that Ohio's "Corrupt Activity Lien Statute"—which authorized the Government to file notice of pending forfeiture proceedings involving a property and acquire a lien on the property—did not violate due process because it did "not affect the use to which the property may be put during the pendency of the action, did not "oust" affected owners from their property, and instead "merely restrained" owners from disposing of their property as proceedings were pending); *James Daniel Good Real Prop*., 510 U.S. at 59 ("The Government's legitimate interests at the inception of forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured" through a "filing of a notice *lis pendens* as authorized by state law," which appropriately prevents pre-trial sale of the property.). And although the Sememchuks characterize their Rives Junction property as a "substitute asset" under 21 U.S.C. § 853(p), which they contend cannot be restrained before conviction, ECF No. 79 at PageID.416–17, (1) the indictment alleges this property was derived directly from proceeds traceable to criminal conduct, *see* Second Superseding Indictment at PageID.1527–29; and (2) the Sixth Circuit has held that the Government "may file notice of lis pendens against substitute assets prior to the entry of a forfeiture order, as long as it has fulfilled the relevant state law requirements." *United States v. Parrett*, 530 F.3d 422, 432 (6th Cir. 2008).

**IV. Conclusion**

Accordingly, it is **ORDERED** that Claimants Tara and Andrew Semenchuks' Motion for

the Return of their Property or Dismissal of the Civil Forfeiture Complaint, ECF No. 79, is

**DENIED.**

Dated: February 24, 2025                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge